**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

|  |  |
|---|---|
| § | |
| § | |
IN RE PILGRIM'S PRIDE CORPORATION § CIVIL ACTION NO. 2:08-cv-419-TJW
SECURITIES LITIGATION § 
| § | |
| § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' Motion to Dismiss Consolidated Class Action Complaint

pursuant to Rules 9(b) and 12(b)(6) (Dkt. No. 46). For the following reasons, the Court

GRANTS-in-part and DENIES-in-part the Defendants' motion.

## I.    BACKGROUND

This is a consolidated class action lawsuit against the officers and directors of Pilgrim's

Pride Corporation (the "Officer Defendants"[1] and "Director Defendants"[2]) by various investors

who purchased the common stock of Pilgrim's Pride Corporation ("Pilgrim's Pride" or the

"Company") in connection with the Company's secondary public offering on May 14, 2008 of

$177 million in additional capital ("Secondary Offering") or who purchased or otherwise

acquired the Company's common stock between May 5, 2008 and October 28, 2008 ("Proposed

Class Period"). The original complaint was filed on October 29, 2008 by Mr. Ronald Acaldo.

On May 21, 2009, the Court appointed the Montgomery County Retirement Board and Cambria

---

[1] The Officer Defendants are Lonnie "Bo" Pilgrim ("L.B. Pilgrim"), J. Clinton Rivers ("Rivers"), and Richard A. Cogdill ("Cogdill").
[2] The Director Defendants are Lonnie Ken Pilgrim ("L. K. Pilgrim"), Charles L. Black ("Black"), Linda Chavez ("Chavez"), S. Key Coker ("Coker"), Keith W. Hughes ("Hughes"), Blake D. Lovette ("Lovette"), Vance C. Miller, Sr. ("Miller"), James G, Vetter, Jr. ("Vetter"), and Donald L. Wass, Ph.D. ("Wass").

County Retirement Board as lead plaintiff. On June 26, 2009, the lead plaintiff filed a consolidated class action complaint which is the subject of this motion to dismiss (the "Complaint"). Plaintiffs allege the following causes of action in the Complaint:

- Count I, securities fraud pursuant to Section 10(b) of the Securities Exchange Act of 1934 ("1934 Exchange Act") and Commissioner Rule 10b-5 ("Rule 10b-5") against the Officer Defendants based on the fraudulent misstatements or omissions made by the Officer Defendants during the Proposed Class Period;
- Count II, controlling person liability pursuant to Section 20(a) of the 1934 Exchange Act against the Officer Defendants;
- Count III, negligent misstatements or omissions in connection with the sale of securities pursuant to Section 11 of the Securities Act of 1933 (the "1933 Securities Act") against the Officer Defendants and the Director Defendants based on alleged misstatements or omissions made in connection with the Company's Secondary Offering on May 14, 2008; and
- Count IV, controlling person liability under Section 15 of the 1933 Securities Act against the Officer Defendants.

The substantive allegations are as follows: Plaintiffs assert that the Officer Defendants fraudulently misrepresented the financial position of the Company to investors by overvaluing "goodwill," a category of assets on the Company's balance sheet, by hundreds of millions of dollars and that these fraudulent statements caused investors to purchase Pilgrim's Pride common stock at inflated rates during the Proposed Class Period. Essentially, Plaintiffs claim that the Company failed to materially impair the goodwill associated with a Pilgrim's Pride acquisition three to six months prior to the quarter in which the goodwill was, in fact, recognized to be impaired. Throughout the Proposed Class Period, and at the time of the Secondary Offering, the Company carried approximately $500 million in goodwill on its balance sheet as an asset that stemmed from a purchase of a competitor in the chicken industry – Gold Kist, Inc. ("Gold Kist") – in December 2006. To fund the Gold Kist acquisition, Pilgrim's Pride drew $1.15 billion from two credit facilities. Under these credit facilities, the Company agreed to

2

certain financial covenants, which, if violated, would trigger an event of default causing the entire amount of the Company's indebtedness to become due. These covenants included a specific fixed charge coverage ratio. Plaintiffs allege that the Company, although it recognized an impairment of the entire $500 million in Gold Kist goodwill at the end of fiscal year 2008, should have recognized a material impairment as of the end of the second or third quarter of 2008, March 29, 2008 and June 28, 2008, respectively. Specifically, the Complaint alleges that the complete impairment of the goodwill was due to harsh market conditions in the chicken industry—an increase in the cost of feed ingredients, weak market demand and poor pricing for chicken breast meat, and a general oversupply of chicken products—that the Officer Defendants knew existed at least as of January 2008. On September 25, 2008, Pilgrim's Pride announced that a substantial loss in the fourth fiscal quarter required it to obtain temporary waivers of its debt covenant ratio obligations from its lenders and disclosed, two months later on November 28, 2008, that the $802 million loss was due in large part to writing down its entire $500 million goodwill account as of September 27, 2008, the end of fiscal year 2008. Pilgrim's Pride then filed for bankruptcy on December 1, 2008.

Under Generally Accepted Accounting Principles ("GAAP"), Plaintiffs argue that Defendants were required to test and impair the value of the goodwill asset within its chicken business unit when the adverse market conditions began to threaten the Company's health by March 29, 2008 or at the latest by June 28, 2008. According to GAAP SFAS No. 142, Plaintiffs allege that Pilgrim's Pride was required to test for impairment of the goodwill recognized in the Gold Kist acquisition on an annual basis and "between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit

below its carrying value." Plaintiffs also allege that such an event or change in circumstances includes a "significant adverse change in legal factors or in the business climate." Because Pilgrim's Pride recognized all of the goodwill from the Gold Kist acquisition in its chicken segment, Plaintiffs contend that the Officer Defendants were required to test the goodwill for impairment as soon as it was more likely than not that an event or change in circumstances reduced the fair value of the chicken segment below the value stated on the Company's balance sheet. While Pilgrim's Pride tested the value of the goodwill on September 29, 2007, after the acquisition of Gold Kist, and then again one year later as of September 27, 2008, Plaintiffs allege that because of the adverse market conditions in the chicken industry that were known to the Officer Defendants at least as of January 2008— an increase in the cost of feed ingredients, weak market demand and poor pricing for chicken breast meat, and a general oversupply of chicken products—the Officer Defendants were required to test the value of the Gold Kist goodwill by the end of the second or third fiscal quarter 2008, before the scheduled annual test at the end of fiscal year 2008. Instead of testing and impairing the goodwill, however, Plaintiffs allege that the Officer Defendants refused to impair the goodwill by even a single dollar until after the Proposed Class Period, masking the ominous financial condition of the Company. The failure of the Officer Defendants to more quickly cause the impairment of the goodwill violated GAAP and, as a result, gives rise to Plaintiffs' claim for securities fraud under the 1934 Exchange Act. Specifically, Plaintiffs claim that the Officer Defendants' statements during the Proposed Class Period assuring investors that Pilgrim's Pride was strategically positioned to survive and grow despite the difficult conditions in the chicken industry due to, among other things, the Company's beneficial credit facilities, were fraudulent misstatements under Section 12 of the

1934 Exchange Act and Rule 10b-5.  Plaintiffs also allege that the Officer Defendants are liable for these fraudulent misstatements as controlling persons under Section 20(a) of the 1934 Exchange Act.

Additionally, Plaintiffs claim that the failure to more quickly impair the goodwill resulted from the negligence of both the Officer and Director Defendants.  More specifically, on May 14, 2008, the Company completed a secondary offering of 7.5 million shares of common stock, raising $177 million in capital (the "Secondary Offering").  Plaintiffs allege that in the offering documents for the Secondary Offering (the "Offering Documents"), the Officer and Director Defendants negligently misrepresented that the goodwill assets of the chicken business were approximately $500 million, in violation of Section 11 of the '33 Securities Act.  Plaintiffs also assert that the Officer Defendants are liable as controlling persons for this negligence under Section 15 of the 1933 Securities Act.

## II.     DISCUSSION

### A.  Count I:  Securities Fraud under Section 10(b) of the 1934 Exchange Act

In count I of the Complaint, Plaintiffs allege violations of Section 10(b) of the Securities Exchange Act of 1934 ("1934 Exchange Act") and of Securities and Exchange Commission Rule 10b-5, which implements Section 10(b).  Private federal securities fraud actions are based on federal securities statutes and their implementing regulations.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).  Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the "use or employ[ment] ... of any ... deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" Securities and Exchange Commission "rules and regulations."  15 U.S.C. § 78j(b).  Commission Rule 10b-

5 implements Section 10(b) by forbidding, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made ... not misleading." 17 C.F.R. § 240.10b-5 (2004).

The Supreme Court has implied from the text of Section 10(b) that it affords a right of action to purchasers or sellers of securities injured by its violation. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). The basic elements of a securities fraud claim under Section 10(b) are: (1) a material misrepresentation or omission; (2) a defendant with scienter concerning the fraud; (3) reliance; (4) damages; and (5) loss causation. *Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 532 (5th Cir. 2008); *see also* Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b)(1)(B), (b)(2). In their motion to dismiss, Defendants do not contend that the Complaint fails to allege the basic elements of: a material misrepresentation or omission in connection with the purchase or sale of a security, reliance, or economic loss. Instead, Defendants only challenge the Complaint's allegations of scienter and loss causation.

### 1. Scienter

To establish liability under Section 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate or defraud. *Tellabs*, 551 U.S. at 319 (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, 193-94, and n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). Normally, a complaint must satisfy Rule 8 of the Federal Rules of Civil Procedure, which merely requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). However, allegations of fraud, such as those brought under Section 10(b), must be pled with particularity,

pursuant to both the Private Securities Litigation Reform Act (PSLRA) and Rule 9(b) of the Federal Rules of Civil Procedure. *Tellabs,* 551 U.S. at 319. Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). However, the PSLRA enhances the requirements of Rule 9(b) in two ways. First, plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . ." 15 U.S.C. § 78u4(b)(1)(B). Second, for "each act or omission alleged" to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *Indiana Electrical,* 537 F.3d at 533.

Only the last requirement alters the usual contours of a Rule 12(b)(6) ruling. Usually, under Rule 12(b)(6), the Court must draw all reasonable inferences in the plaintiff's favor. However, for scienter only, as required by the PSLRA, "a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter." *Indiana Electrical*, 537 F.3d at 533 (citing *Tellabs*, 551 U.S. at 323). In *Tellabs*, the Supreme Court made it clear that in order to qualify as "strong," an inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. The Fifth Circuit, in *Indiana Electrical*, adopted *Tellabs*' 3-prong framework in reviewing scienter allegations on a motion to dismiss a federal securities fraud case pursuant to PSLRA. 537 F.3d 527, 533-34 (5th Cir. 2008).

> First, the allegations must, as in federal pleadings generally, be taken as true. . . . Second, courts may consider documents incorporated in the complaint by reference and matters subject to judicial notice. . . . The facts must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter

7

> has been pled. Third, a court must take into account plausible inferences
> opposing as well as supporting a strong inference of scienter. . . . The inference
> of scienter must ultimately be 'cogent and compelling,' not merely 'reasonable' or
> 'permissible.'

*Indiana Electrical*, 537 F.3d at 533-34 (citing *Tellabs*, 155 U.S. at 322-23). Additionally, for

allegations made on information and belief, the plaintiff must allege with particularity "all facts

on which that belief is formed, i.e., set forth the factual basis for such belief." *ABC Arbitrage*

*Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002).

Therefore, to determine whether the plaintiff has alleged facts that give rise to the

requisite "strong inference" of scienter, the Court must consider plausible, nonculpable

explanations for the defendant's conduct, as well as inferences favoring the plaintiff. *Tellabs*,

155 U.S. at 324. The inference that the defendant acted with scienter "need not be irrefutable,

i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.' . . . Yet

the inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be

cogent and compelling, thus strong in light of other explanations." *Id.* In short, a complaint will

survive only if, when all the allegations in the complaint are taken as true, a reasonable person

would deem the inference of scienter as least a strong as any opposing inference. *Id.* at 326. In

addition, "omissions and ambiguities count against inferring scienter, for plaintiffs must 'state

with particularity facts giving rise to a strong inference that the defendant acted with the required

state of mind.'" *Id.* "While [the Fifth Circuit] will view a complaint *in toto* when considering

whether a complaint has adequately plead scienter, each allegation of fraud must individually

meet the particularity requirements of the PSLRA." *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d

249, 260 (5th Cir. 2005) (internal quotations and citations omitted).

In addition, allegations of scienter must be specifically pled against each individual defendant because the group pleading or group publication doctrine does not apply to securities fraud actions under the PSLRA. *See In re Fleming Sec. Litig.*, 2004 WL 5278716, at * 12 (E.D. Tex. 2004); *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc*., 365 F.3d 353, 363 (5th Cir. 2004). The Fifth Circuit has rejected the group pleading approach to scienter and instead looks to the "state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Indiana Electrical*, 537 U.S. at 533. Accordingly, the Court must address only the allegations contended to adequately show scienter on the part of each individually named defendant to determine whether the complaint sufficiently pleads scienter. *Id*. at 533-34. The complaint must specifically tie individual defendants to the statements or omissions, or it will fail under the PSLRA's heightened-pleading standard. *Fin. Acquisition Partners LP, et al., v. Blackwell et al*., 440 F.3d 278, 287 (5th Cir.2006). As the Fifth Circuit explained, "[c]onsistent with our rejection of the group pleading doctrine, we do not construe allegations contained in the Complaint against the defendants as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded." *Southland*, 365 F.3d at 365 (internal quotations omitted). Therefore, when pleading fraud claims against individuals under Section 10(b) and Rule 10b-5, plaintiffs must distinguish among defendants and allege the role of each. *Southland*, 365 F.3d at 364-65. Corporate officers are not liable for acts solely because they are officers, even where their day-

to-day involvement in the corporation is pleaded. *Id*. However, "[c]orporate statements can be tied to officers if plaintiffs allege they signed the documents on which the statements were made or allege adequately their involvement in creating the documents." *Blackwell*, 440 F.3d at 287.

A plaintiff can demonstrate scienter either with allegations of conscious misconduct or severe recklessness. *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 439 (5th Cir. 2002). Severe recklessness in the context of securities fraud is limited to

> those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003) (quoting *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001)); *see also Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.2d 200, 207 (5th Cir. 2009). Severe recklessness does not require that the defendant be aware of the actual falsity of his or her representation. *In re Triton Energy Ltd. Sec. Litig.*, 2001 WL 872019, at *10 (E.D. Tex. 2001); *see also Abrams*, 292 F.3d at 436 (stating that an allegation of actual knowledge is not required to withstand a motion to dismiss). However, the securities fraud laws do not protect investors against negligence or corporate mismanagement. *Indiana Electrical*, 537 F.3d 527; *see also Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1070 (5th Cir. 1994) ("[C]orporate mismanagement does not, standing alone, give rise to a 10b-5 claim . . ."); *Abrams*, 292 F.3d at 433 (stating that the nature of accounting problems that lead to restatement of a company's financials could "easily arise from negligence, oversight or simply mismanagement, none of which rise to the standard necessary to support a securities fraud action").

Defendants argue that Plaintiff's sole allegation of scienter is that the Officer Defendants violated GAAP by not testing and impairing the goodwill prior to the end of the fourth quarter of fiscal year 2008. Because, Defendants contend, violations of GAAP, standing alone, do not give rise to a strong inference of scienter, Plaintiffs' fraud claims must be dismissed. Additionally, Defendants argue that the Complaint does not allege that the Officer Defendants, or anyone within the Company, had determined in either the second or third quarters of fiscal year 2008 that the Gold Kist goodwill was materially impaired. Defendants also claim that there was no acknowledged wrongdoing or restated financial statements from Pilgrim's Pride suggesting that the Officer Defendants or anyone else in the Company knew that the Gold Kist goodwill should be tested and materially impaired before the end of fiscal year 2008. Finally, Defendants assert that the Officer Defendants' disclosure of the difficult financial circumstances during the Proposed Class Period militates against an inference of scienter.

Plaintiffs, however, argue that all that is required to allege a strong inference of scienter is that the Complaint allege a factual basis for the conclusion that an adjustment for the impairment in the value of the Gold Kist goodwill was warranted at the end of the second and third fiscal quarters of 2008, and that the facts requiring the testing and impairment of the Gold Kist goodwill were known to the Officer Defendants at the time of the alleged misstatements. Plaintiffs allege that under GAAP, the Officer Defendants were required to test the goodwill for impairment before the end of the fiscal year if an event occurred or circumstances changed that would more likely than not reduce the fair value of the chicken reporting unit below its carrying amount. Plaintiffs argue that because the Complaint alleges that the officer defendants knew of the adverse changes in the business climate in the chicken industry—the increased cost of feed

ingredients, the oversupply in chicken, and poor pricing for breast meat—no later than January 2008, the Officer Defendants also knew that circumstances existed that required the testing and material impairment of the Gold Kist goodwill prior to the second and third fiscal quarters of 2008. Plaintiffs also contend that the Complaint sufficiently alleges that the value of the Gold Kist goodwill should have been materially impaired by no later than the end of the second fiscal quarter 2008 because the complaint alleges: (1) that the Officer Defendants themselves described how and to what extent the adverse changes in the business climate of the chicken industry were affecting the Company, (2) the sheer magnitude ($500 million) and timing of the impairment charge demonstrate that a material impairment was required to have been taken much sooner, and (3) the fact that the Company admitted that the eventual complete impairment of the Gold Kist goodwill was due to the same three adverse changes to Pilgrim's Pride's business climate—high feed costs, oversupply of chicken, and poor pricing for breast meat—which were providing huge and unprecedented challenges to the Company's results beginning at least nine months before the end of fiscal year 2008. According to Plaintiffs, these allegations demonstrate that the Gold Kist goodwill should have been materially impaired at the end of the second and third fiscal quarters of 2008.

To adequately plead scienter and survive Defendants' motion to dismiss, the Complaint must state with particularity enough facts to raise an inference of scienter on the part of at least one individual Officer Defendant with regard to at least one allegedly fraudulent statement, and that inference must be such that a reasonable person would conclude that it is at least as compelling as any opposing inference. *See Tellabs*, 155 U.S. at 326; *Indiana Electrical*, 537 F.3d at 533-34. Thus, the Court must consider whether Plaintiffs have satisfied the heightened

pleading requirements for proving scienter for each allegedly fraudulent misrepresentation as to each individual Officer Defendant. *See Fleming*, 2004 WL 5278716, at *12; *Southland*, 365 F.3d at 3665. Although neither Plaintiffs nor Defendants undertook this analysis in their briefing or arguments at the hearing on this motion, the Court will undertake it now.

### a) Second Quarter 2008 Form 10-Q

The first allegedly fraudulent misrepresentations that Plaintiffs plead are misrepresentations on the Form 10-Q for the fiscal second quarter of 2008 ended March 29, 2008 and filed with the SEC on May 5, 2008. Complaint, ¶ 59. Plaintiffs allege that the following information included in the Form 10-Q constitute material misrepresentations:

- Pilgrim's Pride reported goodwill of $499.7 million, total assets of $3.9 billion, a loss from continuing operations (before income taxes) of $175.8 million, and a net loss of $111.4, or $1.67 per share for the second fiscal quarter 2008. Complaint, ¶ 59. For the six month period ended March 29, 2008, the Company reported a loss from continuing operations (before income taxes) of $201.8 million, and a net loss of $143.8 million, or $2.16 net loss per share. *Id*.
- The Form 10-Q reported that as of March 29, 2008, Pilgrim's Pride had fully complied with its debt covenant ratio obligations under its credit facilities. Complaint, ¶ 60.
- The Form 10-Q stated that, in April of 2008, Pilgrim's Pride amended its debt covenant ratios through the end of fiscal 2009 "to levels that the Company believes it can comply with in the near-term despite the current economic issues facing the chicken industry." Complaint, ¶ 61.
- The Sarbanes-Oxley (SOX) certifications signed by all three of the Officer Defendants stated that the Form 10-Q did not contain any untrue statement or omission of a material fact, fairly presented in all material respects the financial condition of the Company, and that the financial statements were completed using internal controls consistent with GAAP. Complaint, ¶ 62.
- The Officer Defendants also certified that the Form 10-Q report of the Company "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and information contained in the Form 10-Z fairly presents, in all material respects, the financial condition and results of operations of the Company." Complaint, ¶ 63.

The Complaint alleges that these statements in the Form 10-Q were materially false and misleading because (1) the Officer Defendants knew or recklessly disregarded that adverse events and circumstances existed in the chicken industry—i.e. high cost of breast meat, oversupply of chicken, and high feed costs—that should have caused them to test and impair the Company's goodwill under GAAP as of March 29, 2008, and (2) that, as a result of these adverse events and circumstances, the Officer Defendants knew or were reckless in not knowing that the Company's goodwill was materially impaired under GAAP as of March 29, 2008. Complaint, ¶ 64. Accordingly, the Complaint alleges that the fraudulent statements in the Form 10-Q concealed from the market that the Gold Kist goodwill was worth materially less than reported and that this material overstatement of the value of the goodwill served to temporarily maintain the Company's debt covenants, even at the renegotiated levels, and allowed the Company to conduct the Secondary Offering. *Id.* The Complaint further alleges that the materially overstated value of the goodwill also masked the fact that the Officer Defendants were falsely overstating the Company's operations, prospects, and financial condition and that Pilgrim's Pride was in serious jeopardy of insolvency. *Id.*

As discussed above, the Fifth Circuit has abandoned the group pleading doctrine, and for a claim against each individual Officer Defendant to survive based on the allegedly fraudulent statements in the Form 10-Q, the Complaint must tie each Officer Defendant to the fraudulent statement and plead facts giving rise to a strong inference of scienter on the part of each Officer Defendant with regard to these statements. *See Fleming*, 2004 WL 5278716, at *12; *Southland*, 365 F.3d at 3665; *see also Barrie*, 397 F.3d at 260.

####    i.    L.B. Pilgrim

Officer Defendant L.B. Pilgrim was the Senior Charmin of the Board of Directors of Pilgrim's Pride and served as the Company's Co-Principal Executive Officer.  Complaint, ¶ 18.  Nevertheless, L.B. Pilgrim cannot be liable for allegedly fraudulent statements of the Company solely because of his positions at Pilgrim's Pride.  *See Southland*, 365 F.3d at 364-65.  Corporate statements can, however, be tied to officers if it is alleged that "they signed the documents on which the statements were made or allege adequately their involvement in creating the documents."  *Blackwell*, 440 F.3d at 287.  Thus, because the Complaint pleads that L.B. Pilgrim signed the SOX certification on the Form 10-Q, the allegedly fraudulent statements on the Form 10-Q and corresponding SOX certification can be attributed to him.  Complaint, ¶ 18.  However, this does not answer the question of whether the Complaint adequately pleads scienter on the part of L.B. Pilgrim with regard to these statements.

A SOX certification, standing alone, is not indicative of scienter.  The Fifth Circuit holds that "a Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements."  *Indiana Electrical*, 537 F.3d at 545 (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)).  "There must be, in other words, facts establishing that the officer who signed the certification had a reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions."  *Id.* (internal quotations and citations omitted).  Although the Complaint nominally pleads that the Officer Defendants as a group were aware of the adverse market conditions in the chicken industry that required the testing and impairment of the Gold

Kist goodwill before the end of the second fiscal quarter 2008, not one of the statements listed in the Complaint to demonstrate this knowledge is attributed to L.B. Pilgrim. *See* Complaint, ¶ 102. Nor does the Complaint adequately allege that L.B. Pilgrim was aware of any of these statements. Instead, the Complaint states merely that L.B. Pilgrim had the power and authority to control the contents of the Company's reports to the SEC because of his position in Pilgrim's Pride. Complaint, ¶ 21. The Complaint also alleges that each of the Officer Defendants was provided with copies of the Company's allegedly fraudulent reports and press releases and knew that the adverse market conditions in the chicken industry required the testing and impairment of the Gold Kist goodwill and, therefore, that the positive representations being made to the public were materially false and/or misleading because their positions in the Company provided them with access to material non-public information. *Id.* However, the Complaint pleads no facts to support this allegation. The Complaint then concludes that each of the Officer Defendants is liable for each of the false statements alleged in the Complaint because those statements were "group published" information and the result of the collective actions of the Officer Defendants. *Id.*

However, as previously noted, the group pleading doctrine is no longer recognized in the Fifth Circuit, and these broad, conclusory allegations of scienter against L.B. Pilgrim based solely on his position within Pilgrim's Pride are insufficient to meet the heightened pleading standard enumerated in Rule 9(b) and the PSLRA. Pleadings of scienter may not rest on the inference that a defendant must have been aware of the fraudulent statement based on his position within the company. *Indiana Electrical*, 537 F.3d at 535. L.B. Pilgrim is not alleged to have made or participated in any direct statements or other conduct that show he was aware: (1)

of the adverse market conditions in the chicken industry, (2) of a violation of GAAP in the preparation of the Form 10-Q, or (3) that the Gold Kist goodwill was materially overvalued on the Form 10-Q. In other words, the Complaint pleads no specific facts demonstrating that L.B. Pilgrim knew or was severely reckless in not knowing that the SOX certification on the Form 10-Q was false when he signed it. *See Kunzweiler v. Zero.net, Inc.*, 2002 U.S. Dist. LEXIS 12080, at *22 (N.D.Tex. 2002) (holding that scienter must exist at the time the allegedly fraudulent statement occurred); *see also  Plotkin et al., v. IP AXESS INC., et al.,* 407 F.3d 690, 698 (5th Cir. 2005) (stating that the rule in the Fifth Circuit is that a "plaintiff cannot charge Defendants with intentionally misleading their investors about facts Defendants may have become aware of after making allegedly misleading statements to the public"). Accordingly, the Complaint's allegation that L.B. Pilgrim committed securities fraud with respect to the second quarter 2008 Form 10-Q or related SOX certification fails to adequately plead scienter under the heightened pleading requirements of Rule 9(b) and the PSLRA.

### ii.    Rivers

Officer Defendant Rivers was a director of Pilgrim's Pride and was elected President and Chief Executive Officer of Pilgrim's Pride on March 5, 2008. Complaint, ¶ 19. Before this, Rivers was the Chief Operating Officer of Pilgrim's Pride. *Id.* Rivers also signed the SOX certifications for the Form 10-Q. *Id.* Because the Complaint alleges that Rivers signed the SOX certification for the second quarter 2008 Form 10-Q, the allegedly fraudulent statements in the Form 10-Q and corresponding SOX certification can be attributed to Rivers. *See Blackwell*, 440 F.3d at 287.

The Court will now consider whether the Complaint has adequately pled River's scienter with regard to these statements. In its attempt to plead facts demonstrating River's knowledge of the negative market conditions in the chicken industry that required the testing and material impairment of the Gold Kist goodwill by the time the second quarter 2008 Form 10-Q was signed, the Complaint identifies statements made by K.L. Pilgrim, the Chairman of the Board of Directors of Pilgrim's Pride, in a Company press release, statements made by Cogdill on a conference call, and a statement in a Company press release that the Complaint does not specifically tie to any individual. Complaint, ¶ 102. However, as discussed previously, these statements, and the knowledge they evidence, cannot be attributed to Rivers absent factual allegations that Rivers participated in the drafting or release of these statements or knew about them. Corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pled. *Barrie*, 397 F.3d at 261. "Without specific allegations the Individual Defendants themselves actually knew about a specific accounting violation or internal control problem, the pleadings are simply too vague to support a strong inference of scienter." *In re Dell Inc., Sec. Litig*., 591 F.Supp.2d 877, 894 (W.D. Tex. 2008). The Complaint alleges no such facts with regard to the statements made by other Pilgrim's Pride officers and directors, and the Complaint cannot assume that Rivers had knowledge of them simply because of his position in the Company.

However, the Complaint does allege that Rivers made the following statement in a March 12, 2008 Company press release: "Our company and industry are struggling to cope with unprecedented increases in feed ingredient costs this year. The cost burden is already enormous

and it's growing even larger." Complaint, ¶ 102. Thus, the Complaint does allege that Rivers knew about the high cost of feed—one of the three adverse market conditions that the Complaint alleges required the testing and impairment of the Gold Kist goodwill—at the time he signed the SOX certification for the second quarter 2008 Form 10-Q. Plaintiffs' theory is that because he knew about this adverse market condition, he also knew or should have known that GAAP required the testing and material impairment of Pilgrim's Pride's goodwill assets. The fact that the Company refused to materially impair the Gold Kist goodwill also meant that the Form 10-Q materially overstated Pilgrim's Pride's financial position and understated its liabilities. Additionally, had the Company tested and materially impaired its goodwill, it would not have been in compliance with its debt covenant ratios under its credit facilities, making the statements in the Form 10-Q that the Company had fully complied with its debt covenants as of March 28, 2008 and that it had amended is debt covenant ratios to levels it could comply with also fraudulent. Finally, Plaintiffs allege that the statements on the SOX certification that the Form 10-Q did not contain any untrue statements or omissions, that it was completed using internal controls consistent with GAAP, and that it fairly represented the financial condition of Pilgrim's Pride were fraudulent. However, the Court is not convinced that River's knowledge of only one of the three adverse market conditions that Plaintiffs allege required the testing and impairment of the goodwill is enough to raise a strong inference that Rivers knew or was severely reckless in not knowing that the Company's goodwill needed to be tested and materially impaired before the end of the second quarter 2008. Accordingly, the Complaint fails to adequately plead River's scienter with regard to the allegedly fraudulent misstatements in the second quarter 2008 Form 10-Q and SOX certification.

### iii. Cogdill

Officer Defendant Cogdill was the Executive Vice President, Chief Financial Officer, Treasurer, and Secretary of the Board of Directors of Pilgrim's Pride. Complaint, ¶ 20. Cogdill signed the Form 10-Q itself as well as the SOX certifications for the Form 10-Q. Complaint, ¶ 20. The allegedly fraudulent statements in the second quarter 2008 Form 10-Q and SOX certifications can, therefore, be attributed to Cogdill. As it did with Rivers, the Complaint uses a series of statements by officers and directors of Pilgrim's Pride in an attempt to prove Cogdill's scienter with respect to the fraudulent statements in the Form 10-Q. *See* Complaint, ¶ 102. However, the Court will consider only those statements that the Complaint specifically alleges Cogdill made or knew about. There are two such statements that Cogdill is alleged to have made before signing the second quarter 2008 Form 10-Q and SOX certification. First, the Complaint alleges that Cogdill stated in a January 29, 2008 conference call that the Company's "results in the first quarter reflect[ed] the huge challenge posed by soaring feed ingredient costs, which have climbed significantly over the past few month [sic] and show no signs of letting up in 2008." Complaint, ¶ 102. Second, the Complaint alleges that Cogdill stated in the same conference call that "the industry is taking some corrective action on the supply side of the breeder stock." *Id*. Taken in the light most favorable to Plaintiffs, these statements suggest that Cogdill knew about the high feed costs and the oversupply of chicken before he signed the second quarter 2008 Form 10-Q and SOX certification. Thus, Cogdill was aware of two of the three adverse market conditions that the Complaint alleges required the testing and impairment of the Company's goodwill assets under GAAP. The question for the Court, then, is whether this knowledge is enough to give rise to a strong inference that Cogdill knew or was severely reckless in not

knowing that the Gold Kist goodwill should have been tested and materially impaired before the end of the second quarter 2008, and, thus, that the financial position of Pilgrim's Pride had been overstated in the second quarter 2008 Form 10-Q.

Even if the Complaint had alleged that Cogdill was aware of all three of the adverse market conditions in the chicken industry that Plaintiffs allege required the testing and impairment of the goodwill under GAAP, the Court is not persuaded that these allegations would be enough to give rise to a strong inference of scienter under Fifth Circuit case law. Essentially, Plaintiffs argue that Cogdill's knowledge of the adverse market conditions suggests that he knew or was severely reckless in not knowing that the adverse market conditions required the testing and material impairment of Pilgrim's Pride's goodwill assets under GAAP before the scheduled annual test at the end of fiscal year 2008. Complaint, ¶¶ 36-48 and 102. GAAP SFAS No. 142 requires that a company's goodwill assets be tested on an annual basis and "between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying costs." Complaint, ¶ 36. The Complaint acknowledges that Pilgrim's Pride valued the Gold Kist goodwill after the acquisition was completed in September of 2007, and the Complaint makes no allegations that the value placed on the goodwill at this time was inaccurate. Complaint, ¶ 40. The Complaint also admits that the Company tested the value of the goodwill one year later in September of 2008, at which time the goodwill was completely impaired. The results of this test were disclosed in the Company's fourth quarter 2008 earnings report released in November 2008, and the Complaint does not allege that the results of this test were flawed. Complaint, ¶ 41. Thus, Plaintiffs' allegations rest on the Complaint's assertion that GAAP required Pilgrim's Pride to test and impair the value of

the Gold Kist goodwill before the scheduled annual test at the end of fiscal year 2008. Specifically, the Complaint alleges that the Company was required to test and impair the value of the Gold Kist goodwill as soon as the Officer Defendants became aware of the adverse conditions in the chicken industry—high feed costs, an oversupply of chicken, and poor breast meat pricing—that reduced the fair value of the chicken segment below the value stated on the Company's balance sheet. *See* Complaint, ¶¶ 36-48 and 102. Thus, the Complaint's allegations boil down to the fact that Cogdill, as well as the other Officer Defendants, violated GAAP by not testing and impairing the Gold Kist goodwill at the end of the second quarter 2008, and that, as a result, the financial position of the company was overstated on the second quarter 2008 Form 10-Q.[3]

However, the Fifth Circuit has repeatedly held that the "mere publication of inaccurate accounting figures, or failure to follow GAAP, without more, does not establish scienter." *Indiana Electrical*, 537 F.3d at 534; *see also Blackwell*, 440 F.3d at 290 ("[F]ailure to follow accounting standards, without more, does not establish scienter."); *Barrie*, 397 F.3d at 264; *Abrams*, 292 F.3d at 430; *Melder v. Morris*, 27 F.3d 1097, 1103 (5th Cir. 1994) ("boilerplate averments that the accountants violated particular standards are not, without more, sufficient to support inferences of fraud"); *Umsted v. Andersen LLP*, 2003 WL 222621, at *3 (N.D. Tex. 2003) (noting that there is a judicial consensus that mere general allegations of violations of

---

[3] The Complaint also alleges that Pilgrim's Pride may have actually tested the Gold Kist goodwill at some point during the Proposed Class Period but concealed the results of that test from the public. Complaint, ¶¶ 103 and 105. However, the Complaint pleads no facts that support this accusation. "An unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss." *Abrams*, 292 F.3d at 432. "Such allegations must have corroborating details regarding the content of allegedly contrary reports, their authors and recipients." *Id.* Thus, the Court will not consider this allegation in ruling on Defendants' motion to dismiss.

GAAP and/or GAAS are insufficient to state a claim for securities fraud). In order to overcome the motion to dismiss, Plaintiffs must link the alleged violation of GAAP with fraudulent intent by pleading facts that give rise to a strong inference that Cogdill knew that the information published on the Form 10-Q and related SOX certification was materially false information, or that Cogdill was severely reckless in publishing that information. *See Indiana Electrical*, 537 F.3d at 534. Thus, proving that the Company violated GAAP by not testing the goodwill before the end of the second quarter 2008 is not enough to give rise to a strong inference of scienter on the part of Cogdill with regard to the second quarter 2008 Form 10-Q and SOX certification. Plaintiffs must also plead facts giving rise to a strong inference that (1) Cogdill knew or was severely reckless in not knowing that the Company had violated GAAP by not testing the goodwill, (2) Cogdill knew or was severely reckless in not knowing that testing the goodwill would result in it being materially impaired, and (3) Cogdill knew or was severely reckless in not knowing that the failure to test and materially impair the Gold Kist goodwill resulted in the overstatement of Pilgrim's Pride's financial condition and its ability to comply with its debt covenant ratios on the second quarter 2008 Form 10-Q. The Complaint does not plead facts suggesting that Cogdill knew any of these three things when he signed the second quarter 2008 Form 10-Q or the SOX certification.

Even if the Court found that Cogdill's alleged knowledge of the difficult market conditions in the chicken industry necessarily meant that he knew that GAAP required the testing of the Gold Kist goodwill before the end of the second quarter 2008, the Complaint does not allege any facts whatsoever that Cogdill, or anyone else at Pilgrim's Pride, knew at that time that testing the Gold Kist goodwill would lead to its material impairment. Plaintiffs contend that the

sheer magnitude and timing of the impairment charge demonstrate that a material impairment was required to have been taken much sooner than the end of fiscal year 2008. However, the assumption that the goodwill would be materially impaired in March 2008 because it was totally impaired when tested in September 2008 is not enough to give rise to a strong inference of scienter. Similarly, the Complaint does not allege any facts suggesting that Cogdill knew that a material impairment of the Gold Kist goodwill would result in wildly inaccurate financial statements for the second quarter of 2008 or in the Company's inability to meet its debt covenant ratios. The Complaint, therefore, does not adequately alleged that Cogdill *knew* that the statements in the Form 10-Q and SOX certification were fraudulent at the time he signed them.

Courts, however, appear willing to allow a complaint alleging GAAP violations to survive at the pleading stage where "the magnitude of the GAAP violation is exceptionally large in proportion to previously reported numbers, where the allegations are accompanied by detailed allegations of insider trading, or where there are myriad other detailed allegations of wrongdoing." *Fleming*, 2004 WL 5378716, at * 38 (citing Securities Litigation Update, SJ014 ALI-ABA 505, 516 (2003)). Although the Complaint makes conclusory allegations that, if tested, the goodwill would have been materially impaired as of the end of the second quarter 2008, it pleads virtually no facts to support this assertion other than the fact that the goodwill was completely impaired when tested six months later in September 2008. Additionally, the Complaint does not plead by how much the goodwill would have been impaired if tested before the end of the second quarter 2008 other than to state that it would have been "materially impaired." For these reasons, the Complaint does not provide enough facts to infer that the

magnitude of the alleged failure to test and impair the goodwill in violation of GAAP was exceptionally large in proportion to previously reported numbers.

Similarly, the Complaint makes no allegations of insider trading against Cogdill or any of the other Officer Defendants. Plaintiffs do, however, attempt to bolster their scienter allegations by arguing that the Officer Defendants, including Cogdill, had fraudulent motives for failing to test and impair the goodwill before the end of fiscal year 2008. *See* Complaint, ¶¶ 47, 48, and 53. Appropriate allegations of motive and opportunity may "meaningfully enhance the strength of the inference of scienter." *Nathenson*, 267 F.3d at 412; *see also Abrams*, 292 F.3d at 430. However, some "motives," particularly those possessed by almost all corporate executives, do nothing to aid a plaintiff in pleading scienter. *Flemming*, 2004 WL 5278716, at * 12. "Scienter in a particular case may not be footed solely on motives universal to corporate executives" such as the desire to maintain the company's credit ratings or maintain high stock price to increase its value in acquiring companies. *Indiana Electrical*, 537 F.3d at 544. For example, in *Indiana Electrical*, the Fifth Circuit rejected as appropriate motive allegations the plaintiff's pleadings that the defendants refused to write off impaired goodwill following an acquisition because they feared an impact on the company's debt covenants and a consequent downgrade of its credit rating. *Id.* "The desire to maintain a high credit rating is universally held among corporations and their executives and consequently does not contribute significantly to an inference of scienter." *Id.* The Complaint alleges that the Officer Defendants issued fraudulent results for the second quarter of 2008 to conceal the fact that the Gold Kist goodwill was materially impaired and that the Company's liabilities were materially understated because they wanted to temporarily avoid devastating losses to the Company in the hundreds of millions of dollars.

Complaint, ¶ 47. Additionally, the Complaint contends that the Officer Defendants conspired to amend the Company's debt covenant ratios to make the threshold for triggering a default under that ratio higher and to obtain additional funds to pay down the Company's debt and bolster Pilgrim's Pride's liquidity and balance sheet through the Secondary Offering because they knew that any material impairment of the Company's goodwill would likely trigger a default of its debt covenant rations under its credit facilities. Complaint, ¶ 48. The Complaint also alleges that the Officer Defendants used the Secondary Offering to get more liquidity and conceal their fraud— i.e. to conceal that the goodwill should be impaired and that the Company's total liabilities and ability to comply with its debt covenant ratios had been overstated. Complaint, ¶ 48 These motive allegations are similar to those that courts have found are universal to corporate executives and, thus, do nothing to bolster the allegation of scienter against Cogdill or any other Officer Defendant.

Finally, the Complaint does not allege a myriad of other allegations of wrongdoing to bolster its allegations of scienter based on the Officer Defendants' alleged GAAP violation. The Complaint does include a section titled "Additional Facts Evidencing the Officer Defendants' Scienter," which states that the Officer Defendants' scienter is supported by the following additional facts:

- The Company's increasing negative cash flow;
- The timing of the April 30, 2008 amendments to the Company's credit agreements which allowed the Company to satisfy its debt covenants;
- The timing of the Secondary Offering where the Company raised $177 million in cash from investors;
- The fact that the goodwill was totally impaired when tested at the end of fiscal year 2008; and
- The fact that Rivers and Wright resigned as President and CEO and COO, respectively, as a result of the Company's bankruptcy reorganization.

Complaint, ¶ 106(a)-(e). However, the Court is not convinced that any of these facts serve to significantly bolster the Complaint's allegations of scienter against Cogdill, or any of the other Officer Defendants. Although the Complaint makes conclusory allegations that the Officer Defendants reviewed the Company's financial results and were, thus, aware of the increasing negative cash flow from operations, the Officer Defendants included this information on the company's financial statements and did not hide it from the public. Additionally, the Complaint makes no allegations that the financial statements of the Company during this time period were inaccurate in any way other than the failure to test and impair the Gold Kist goodwill. The timing of the April 30, 2008 amendments to the debt covenant ratios under the Company's credit facilities and the timing of the Secondary Offering raising additional capital from investors is not particularly suspicious. The Company disclosed the difficult market conditions in the chicken industry and it is not surprising that the Company and the Officer Defendants would make these attempts to bolster the Company's financial position to help weather the storm. Additionally, the fact that the goodwill was totally impaired when tested as of September 2008, while suspicious, does not necessarily imply that the goodwill was materially impaired as of March 2008 or, more to the point, that the individual defendants knew it was materially impaired by that date. Finally, the resignation of Rivers and Wright as part of the reorganization of Pilgrim's Pride in bankruptcy does not bolster the Complaint's scienter allegations. The Complaint pleads no facts to suggest that these resignations were the result of fraudulent acts by any of the Officer Defendants, and the more logical assumption is that they were the result of the incompetence or corporate mismanagement of these defendants. In *Abrams*, the Fifth Circuit held that the plaintiffs' circumstantial evidence relating to (1) the defendants' receipt of financial reports that

apprised them of the company's true financial status, (2) the company's violations of GAAP, (3) the defendants' desire to raise money and protect their incentive compensation, and (4) the timing of the resignation of certain accounting department employees was insufficient to demonstrate a strong inference of scienter. 292 F.3d at 431-35. Accordingly, the additional facts allegedly bolstering the Officers Defendants' scienter are simply not enough to boost the Complaint's scienter allegations such that they give rise to a strong inference of scienter that is cogent and compelling in light of the competing inferences.

However, the allegations against Cogdill with regard to the second quarter 2008 Form 10-Q and SOX certification will survive if the Complaint pleads enough facts to suggest that Cogdill was *severely reckless* in not knowing that failing to test the goodwill was a violation of GAAP, that testing the goodwill in accordance with GAAP would result in a material impairment of the goodwill, and that a material impairment of the goodwill would have a devastating effect on the financial statements of the Company and the Company's ability to comply with its debt covenant ratios. As discussed previously, severe recklessness in a securities fraud case requires more than allegations of inexcusable negligence or corporate mismanagement, it requires facts suggesting "an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Rosenzweig*, 332 F.3d at 866. The Complaint simply does not plead enough facts to suggest such an extreme departure from the standard of ordinary care on the part of Cogdill.

The most logical inference to be drawn from the facts pled in the Complaint is that, at most, Cogdill is guilty of negligence or corporate mismanagement for not recognizing that the

adverse market conditions required the testing of the Gold Kist goodwill prior to the annual test scheduled for the end of fiscal 2008.  However, the securities fraud laws do not protect investors against negligence or corporate mismanagement.  *Indiana Electrical*, 537 F.3d 527; *see also Tuchman*, 14 F.3d at 1070 ("[C]orporate mismanagement does not, standing alone, give rise to a 10b-5 claim . . ."); *Abrams*, 292 F.3d at 433 (stating that the nature of accounting problems that lead to restatement of a company's financials could "easily arise from negligence, oversight or simply mismanagement, none of which rise to the standard necessary to support a securities fraud action").  Additionally, the fact that Cogdill disclosed the negative market conditions of which he was aware to the public suggests that he was not attempting to conceal these market conditions from the public or paint an overly optimistic picture of the Company's financial position.  Therefore, the Court finds that the facts pled do not give rise to a cogent and compelling inference of scienter on the part of Cogdill with respect to the second quarter 2008 Form 10-Q and SOX certification.

### b)  Third Quarter 2008 Form 10-Q

The Complaint also alleges that the Officer Defendants are liable for fraudulent statements regarding the Company's financial results for the third quarter ended June 28, 2008 made on Pilgrim's Pride's third quarter 2008 Form 10-Q, filed with the SEC on July 30, 2008.  Complaint, ¶ 76.  The allegedly fraudulent statements include:

- For the third quarter of fiscal year 2008, Pilgrim's Pride reported goodwill of $499.7 million, total assets of $3.9 billion, a loss from continuing operations (before income taxes) of $278.5 million, and a net loss of $196.5 million, or $2.90 per share.  Complaint, ¶ 76.
- The Company stated that it had fully complied with its debt covenant ratios as of June 28, 2008.  Complaint, ¶ 77.
- The Form 10-Q stated that in April 2008, Pilgrim's Pride amended its debt covenant ratios through the end of fiscal 2009 "to levels that the Company believes it can comply

29

with in the near-term despite the current economic issues facing the chicken industry." Complaint, ¶ 78.

- The Sarbanes-Oxley (SOX) certifications signed by all three of the Officer Defendants stated that the Form 10-Q did not contain any untrue statement or omission of a material fact, fairly presented in all material respects the financial condition of the Company, and that the financial statements were completed using internal controls consistent with GAAP. Complaint, ¶¶ 62 and 79.

- The Officer Defendants also certified that the Form 10-Q report of the Company "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company." Complaint, ¶¶ 63 and 79.

The Complaint alleges that these statements in the Form 10-Q were materially false and misleading for the same reasons that the Form 10-Q for the second quarter of 2008 were misleading: (1) the Officer Defendants knew or recklessly disregarded that adverse events and circumstances existed in the chicken industry—i.e. high cost of breast meat, oversupply of chicken, and high feed costs—that should have caused them to test and impair the Company's goodwill under GAAP as of June 28, 2008, and (2) that, as a result of these adverse events and circumstances, the Officer Defendants knew or were reckless in not knowing that the Company's goodwill was materially impaired under GAAP as of June 28, 2008. Complaint, ¶ 80. Accordingly, the Complaint alleges that the fraudulent statements in the Form 10-Q concealed from the market that the Gold Kist goodwill was worth materially less than reported and that this material overstatement of the value of the goodwill served to temporarily maintain the Company's debt covenants, even at the renegotiated levels, and allowed the Company to conduct the Secondary Offering. *Id.* The Complaint further alleges that the materially overstated value of the goodwill also masked the fact that the Officer Defendants were falsely overstating the Company's operations, prospects, and financial condition and that Pilgrim's Pride was in serious jeopardy of insolvency. *Id.*

### i. L.B. Pilgrim

Because the Complaint pleads that L.B. Pilgrim signed the SOX certification for this Form 10-Q, the allegedly fraudulent statements contained in the Form 10-Q and the SOX certification can be attributed to L.B. Pilgrim. *See* Complaint, ¶ 18. However, the Complaint pleads no more specific facts giving rise to an inference of scienter against L.B. Pilgrim with regard to the third quarter 2008 Form 10-Q than it did with respect to the second quarter 2008 Form 10-Q. Thus, for all of the reasons discussed above in the Court's consideration of the allegations of scienter against L.B. Pilgrim with regard to the second quarter 2008 Form 10-Q, the Court finds that the Complaint has not pled sufficient facts to give rise to a strong inference of scienter on the part of L.B. Pilgrim with regard to the allegedly fraudulent statements in the third quarter 2008 Form 10-Q and corresponding SOX certification.

### ii. Rivers

The complaint alleges that Rivers signed the SOX certification for the third quarter 2008 Form 10-Q, and so the allegedly fraudulent statements contained in the Form 10-Q may be attributed to Rivers. *See* Complaint, ¶ 19. In attempting to allege River's scienter with regard to these misstatements, the Complaint references a number of statements that it attributes to other officers and directors of Pilgrim's Pride. However, for the reasons already discussed, the Court will consider only those statements that the Complaint alleges were made by Rivers or of which Rivers was aware in determining River's scienter. The Complaint lists a number of statements made by Rivers on conference calls or in company press releases from March through June of 2008 that demonstrate River's knowledge of all three of the adverse market conditions—high feed costs, oversupply of chicken, and poor breast meat pricing—that the Complaint alleges

required the testing and impairment of the Gold Kist goodwill at the time the third quarter 2008 Form 10-Q was issued. *See* Complaint, ¶¶ 102 and 104. These statements include:

- "Our company and industry are struggling to cope with 'unprecedented increases in feed ingredient costs this year. The cost burden is already enormous and it's growing even larger. [sic]"
- "Our financial results in the second quarter of fiscal 2008 reflect the crisis facing our company and industry from record-high feed costs caused by the federal government's deeply flawed ethanol policy."
- "The operating environment for chicken producers today is among the most difficult I have seen during my 27 years in the business[.]"
- "[O]ur financial results in the second quarter of fiscal 2008 reflect the significant unprecedented challenges facing our company and industry from record high feed costs and an oversupply of chicken in the United States."
- "The amount of chicken in U.S. cold storage may have been dampening commodity prices as inventories for March were 31% higher than year-ago levels."
- "[B]reast meat pricing [is] down year-over-year."
- "Looking ahead, we believe that high grain costs will continue to exert pressure on our operating results during the second half of fiscal 2008."
- "Taking a look at markets, breast meat, in the face of higher costs, has been below last year all this spring."
- "[T]he difficulty . . . is that prices of grain escalated so quickly last fall and into the first part of the year that we have been unable to efficiently pass those prices along as quickly as they have gone up. And therefore, we've got the need to restrict supply."
- "[B]reast meat is below where we were year ago levels. April we were significantly below."
- "Our supply in chicken, we are oversupplying . . . we need to see some balance in the supply."
- "Simply put, at this time there is still too much breast meat available to drive market pricing significantly higher."

Complaint, ¶¶ 102 and 104. These statements demonstrate that Rivers was aware of all three of the adverse market conditions allegedly requiring the testing and impairment of the Gold Kist goodwill—high feed costs, oversupply of chicken, and poor breast meat pricing—by the end of the third quarter 2008 when he signed the Form 10-Q and SOX certification. However, as discussed in the Court's analysis of the allegations of scienter against Cogdill with regard to the second quarter 2008 Form 10-Q, knowledge of these three difficult market conditions is simply

not enough to give rise to a strong inference of scienter under *Tellabs*. The Complaint pleads no additional facts supporting a strong inference of scienter against Rivers other than those previously discussed in analyzing the allegations of scienter against Cogdill for the second quarter 2008 Form 10-Q. Accordingly, the Court finds that the Complaint has not met the heightened pleading requirements for alleging scienter against Rivers as to the third quarter 2008 Form 10-Q and related SOX certification.

### iii. Cogdill

The Complaint alleges that Cogdill signed both the third quarter 2008 Form 10-Q and the corresponding SOX certification. Complaint, ¶ 20. Accordingly, the allegedly fraudulent statements contained in the Form 10-Q may be attributed to Cogdill. For the reasons previously discussed, the Court will consider only those statements that the Complaint alleges were made by Cogdill or of which Cogdill had knowledge in deciding if Cogdill's scienter has been adequately pled with regard to the third quarter 2008 Form 10-Q and SOX certification. The Complaint pleads no additional statements made by Cogdill or other facts to support its scienter allegations against Cogdill for the third quarter Form 10-Q and SOX certifications that it did for the second quarter Form 10-Q and SOX certifications. Thus, for all the reasons discussed in the Court's holding that the Complaint did not adequately plead Cogdill's scienter for the second quarter 2008 Form 10-Q and SOX certification, the Court also holds that the Complaint has not plead sufficient facts to give rise to a strong inference of Cogdill's scienter with regard to the allegedly fraudulent statements made in the third quarter 2008 Form 10-Q and SOX certification.

### c) May 5, 2008 Conference Call with Analysts

The Complaint alleges that Pilgrim's Pride held a conference call for analysts to discuss its second quarter 2008 results on May 5, 2008. Complaint, ¶ 65. In that conference call, the Complaint claims that Cogdill made the following fraudulent statements:

- "This morning we also reported that we had taken proactive steps to add greater flexibility to our existing covenants under our credit facilities. These steps also will provide substantial room to grow our business under normal practices as we seek to put the challenging industry's conditions behind us. . . . As we have stated in the past, we have a good group of lenders who have faith in our management team and understand the cyclical nature of the chicken industry and the challenges facing us today. They appreciate the proactive steps we have taken to improve our competitive position and our focus on generating long-term value for our shareholders. With these amendments, they have shown their support by relaxing certain of our covenants to afford our business the room we would need under all but the most dire of circumstances through the end of fiscal 2009." Complaint, ¶ 65.
- In response to a question regarding what to use as the annualized interest expense level given the debt covenant changes, Cogdill stated: "Yes, the – the total interest expense itself is not going to be materially different, at least at this point. What we did is we wanted –basically coming out of last earnings release it was clear that there was a lot more focus and attention being levied on the covenants than what we appreciated and we wanted to get out ahead of that and make sure people understood that to the extent there was going [t]o be stress, we could get our banks to go along with us and some kind of a reasonable transition." Complaint, ¶ 66.
- Cogdill further stated that Pilgrim's Pride "also proactively went out to [its] lenders" to get "some relief under our financial covenants, just to make sure that our public and our interested shareholders understand that our bank agreements are there for us, and the liquidity that we need to operate this business will not be affected." Complaint, ¶ 67.
- In response to a question regarding why the Company needed to raise equity through the Secondary Offering since its available credit exceeded its needs, Cogdill responded: "I think it was more insurance than anything else. It was not a pressing need. It was something we wanted to take a little bit of the pressure off the balance sheet as a proactive measure. I would say it falls in line with the realignment of the bank covenants. We really didn't have any covenant issues either, but we wanted to get out ahead of the curve." Complaint, ¶ 68.

The focus of the Complaint appears to be Cogdill's statements describing the decision to amend the Company's debt covenants as an effort to "provide substantial room to grow our business," to

get "ahead of the curve," "a proactive measure," and "more insurance than anything else." *See* Complaint, ¶¶ 65-70. The Complaint alleges that these statements were false and misleading because the real reason the Officer Defendants amended the debt covenants was because they knew or recklessly disregarded that (1) the Gold Kist goodwill was materially impaired as of January 2008, and (2) coupled with the adverse market conditions affecting the chicken industry, this material impairment would likely cause the Company to fail to comply with its fixed charge covenant ratio, thereby triggering an event of default under its credit facilities. Complaint, ¶ 70.

### i. Cogdill

The Complaint's allegations against Cogdill demonstrate that Cogdill was aware of two of the three adverse market conditions affecting the chicken industry as of at least January 2008, and, therefore, that he knew or was severely reckless in not knowing that GAAP required the Company to test and impair the Gold Kist goodwill at least as of the end of the second quarter 2008. *See* Complaint, ¶ 102. Additionally, the Complaint alleges that Cogdill knew or was severely reckless in not knowing that a material impairment of the goodwill would likely cause Pilgrim's Pride to default on its debt covenant ratios under its credit facilities, and Cogdill's statements that the Company renegotiated the debt covenants merely as a precaution or proactive measure were fraudulent when made. Complaint, ¶ 70. However, the Complaint relies on the same set of facts discussed with regard to Cogdill's scienter for the second and third quarter 2008 Form 10-Qs to plead that Cogdill knew or was severely reckless in not knowing that his statements regarding the rationale for amending the Company's debt covenant ratios on the Mary 5, 2008 conference call were fraudulent—i.e. that Cogdill made statements suggesting that he was aware of two of the three adverse market conditions allegedly requiring the testing and

impairment of the Gold Kist goodwill.[4]  Complaint, ¶ 102.  As discussed above, these factual allegations are not enough to give rise to a strong inference of scienter, especially since the most logical inference from the facts pled in the Complaint and the fact that Cogdill disclosed the negative conditions of which he was aware is that Cogdill believed these statements to be true when made, even if that belief was the result of negligence or corporate mismanagement. Accordingly, for all the reasons discussed in the Court's holding that the Complaint did not adequately plead Cogdill's scienter for the second and third quarter 2008 Form 10-Qs and SOX certifications, the Court also holds that the Complaint has not plead sufficient facts to give rise to a strong inference of Cogdill's scienter with regard to the allegedly fraudulent statements made on the May 5, 2008 conference call with analysts.

### ii.    L.B. Pilgrim and Rivers

Because the Complaint pleads no facts linking either L.B. Pilgrim or Rivers to this statement, any allegations of securities fraud against either L.B. Pilgrim or Rivers based on this statement fail to adequately plead scienter.

### d)  June 4, 2008 Presentation

The Complaint also alleges that Rivers and Cogdill made fraudulent statements in a presentation at the Stephens Inc. Spring Investment Conference on June 45, 2008.  Complaint, ¶ 71.  During his prepared remarks, Cogdill made the following allegedly fraudulent statements:

- "On the financial side, we've tried to do everything we can to make sure we have the flexibility we need to run the business.  We started by getting out ahead of the debt agreements we had, made sure that we had plenty of flexibility there, and we amended

---

[4] Again, the Court will consider only statements or knowledge that the Complaint specifically alleges can be attributed to Cogdill.  The statements and knowledge of other Pilgrim's Pride officers and directors will not, therefore, be attributed to Cogdill where the Complaint does not allege facts suggesting that Cogdill participated in the statements or had knowledge of them.

our covenant structure through the end of 2009. We then issued 7.5 million shares of equity mid-month last month, raised $177 million net proceeds on that. And those two combined, I'll show you a little bit later the effect they had on some of our flexibility." Complaint, ¶ 71.

- "If you look at the covenants that were amended, basically it all kind of comes to roost in the tangible net worth. If you look at where we were at the end of the second quarter, we had tangible net worth of $451 million with a revised covenant of $250 million. So, where we are today is we have about $380 million of cushion, if you will, in that covenant, and that was basically $200 million created through the amendment to the credit facilities, and the other $180 million approximately through the equity issuance. And so, I think just going forward what you're going to see from us on the balance sheet side is to continue to be proactive in managing the flexibility. We've always carried a lot of flexibility to weather the cyclicality that we have in this industry." Complaint, ¶ 72. [5]

The Complaint focuses its allegations on Cogdill's statements that the Company was "getting out ahead of the debt agreements" in order to make sure that Pilgrim's Pride had "plenty of flexibility," and that the Company had a $380 million cushion as a result of amending its debt covenants and the Secondary Offering. *See* Complaint, ¶¶ 71, 72, and 74. The Complaint alleges, however, that these statements were fraudulent for exactly the same reason that the statements Cogdill made on the May 5, 2008 conference call were fraudulent—i.e. that the Officer Defendants really amended the debt covenants and issued the Secondary Offering because they knew or recklessly disregarded that (1) the Company's goodwill recognized in the Gold Kist acquisition was materially impaired as of January 2008, and (2) coupled with the high costs of producing chicken, the inability to pass such costs onto customers, the oversupply of chicken, and poor pricing for breast meat, such material impairment would likely cause the

---

[5] The Complaint also discusses reports issued by Deutsche Bank after the June 4, 2008 presentation parroting Cogdill's remarks. Complaint, ¶ 73. However, the Complaint does not appear to attribute the statements in this report to Cogdill or Rivers or allege that either Cogdill or Rivers are liable for the report. *See* Complaint, ¶ 74. Plaintiffs also make no argument in their briefing on the motion to dismiss that any of the Officer Defendants are liable for the statements made by third party analysts in the Complaint. Accordingly, the Court will not consider the statements made in the Deutsche Bank report as allegedly fraudulent statements for purposes of its analysis of the motion to dismiss.

Company to fail to comply with its fixed charge covenant ratio, thereby triggering an event of default under its credit facilitates. Complaint, ¶ 74.

### i. Cogdill

Because the Complaint specifically pleads that Cogdill made the statements at the June 4, 2008 presentation, he can be held liable for them if the Complaint also adequately pleads his scienter with regard to these statements. However, the allegations of scienter against Cogdill for these allegedly fraudulent statements rely on the same theory and set of operative facts as the scienter allegations for the statements Cogdill made on the May 5, 2008 conference call with analysts. Accordingly, the Court will rely on that analysis in ruling that the Complaint has not alleged enough facts to give rise to a strong inference of scienter with regard to Cogdill's statements at the June 4, 2008 presentation at the Stephens Inc. Spring Investment Conference.

### ii. Rivers

Although the Complaint does not allege that Rivers made any direct statements at the June 4, 2008 conference, it attempts to hold Rivers accountable for Cogdill's statements at that conference, presumably under the theory that Rivers was present when Cogdill made the allegedly fraudulent statements and did not correct him. *See* Complaint, ¶ 71. Rivers may be held liable for Cogdill's statements of he knew that the statements were fraudulent when Cogdill made them, but failed to correct them. "In a case where it is pled with specificity that one defendant knowingly uttered a false statement and the other defendant knowingly failed to correct it . . . the fraud is sufficiently pleaded as to each defendant." *Barrie*, 397 F.3d at 262. In *Barrie*, the Fifth Circuit reversed a district court's dismissal of a 1934 Exchange Act claim where the plaintiff alleged that one defendant made a knowingly fraudulent statement during a

conference call with analysts and another defendant, knowing the fraudulent nature of the statement, failed to correct it. *Id.* Thus, Rivers may be held liable for Cogdill's allegedly fraudulent statements if the Complaint adequately alleges that Rivers knew or was severely reckless in not knowing that Cogdill's statements at the June 4, 2008 conference were fraudulent but failed to correct them.

The Complaint, again, relies on the same set of facts to demonstrate River's knowledge of the three negative market conditions in the chicken industry already discussed by the Court with regard to River's allegedly fraudulent statements on the third quarter Form 10-Q and SOX certification. *See* Complaint, ¶¶ 102 and 104. As discussed above, the fact that Rivers was aware of the adverse conditions in the chicken industry—high feed costs, oversupply of chicken, and poor breast meat pricing—is not enough to give rise to a strong inference of scienter. Accordingly, for all the reasons discussed in the Court's holding that the Complaint did not adequately plead Cogdill's scienter for allegedly fraudulent statements made in the third quarter 2008 Form 10-Q and SOX certification, the Court also holds that the Complaint has not plead sufficient facts to give rise to a strong inference of River's scienter with regard to the allegedly fraudulent statements made at the June 4, 2008 presentation.

### iii.    L.B. Pilgrim

Because the Complaint pleads no facts linking L.B. Pilgrim to the statements made at the June 4, 2008 conference, any allegations of securities fraud against L.B. Pilgrim based on these statements fail to adequately plead scienter.

### e) July 29, 2009 Press Release

On July 29, 2008, Pilgrim's Pride issued a press release disclosing its fiscal third quarter financial results, including a net loss from continuing operations of $48.3 million or $0.69 per share. Complaint, ¶ 75. The Complaint alleges that Rivers fraudulently stated in the press release that the Company "amended [its] debt covenants and completed a stock offering for $177 million to provide [Pilgrim's Pride] with more financial flexibility to manage our business through a tumultuous period." *Id.* The Complaint makes no specific allegations as to why this statement was fraudulent. However, taking the allegations in the Complaint as a whole, the Court can reasonably assume that the Complaint intends to allege that this statement was fraudulent when made because Rivers and the other Officer Defendants really amended the debt covenants and issued the Secondary Offering because they knew or recklessly disregarded that (1) the Company's goodwill recognized in the Gold Kist acquisition was materially impaired as of January 2008, and (2) coupled with the high costs of producing chicken, the inability to pass such costs onto customers, the oversupply of chicken, and poor pricing for breast meat, such material impairment would likely cause the Company to fail to comply with its fixed charge covenant ration, thereby triggering an event of default under its credit facilitates. *See* Complaint, ¶¶ 70 and 74.

### i.    Rivers

The Complaint pleads no additional statements made by Rivers or other facts to support its scienter allegations against Rivers for this allegedly fraudulent statement other than those facts already discussed and dismissed by the Court in its analysis of the scienter allegations against Rivers with regard to the third quarter 2008 Form 10-Q and June 4, 2008 presentation.

*See* Complaint, ¶¶ 102 and 104. Consequently, for all the reasons discussed in the Court's holding that the Complaint did not adequately plead Cogdill's scienter for allegedly fraudulent statements made in the third quarter 2008 Form 10-Q and SOX certification and the June 4, 2008 presentation, the Court also holds that the Complaint has not pled sufficient facts to give rise to a strong inference of River's scienter with regard to the allegedly fraudulent statements made in the July 29, 2008 press release.

### ii. L.B. Pilgrim and Cogdill

Because the Complaint pleads no facts linking either L.B. Pilgrim or Cogdill to River's statement in the July 29, 2008 press release, any allegations of securities fraud against either L.B. Pilgrim or Cogdill based on this statement fail to adequately plead scienter.

### f) July 29, 2008 Conference Call with Analysts

The Complaint also alleges that on July 29, 2008, Pilgrim's Pride held a conference call for analysts in which both Rivers and Cogdill participated. Complaint, ¶ 81. The Complaint contends that, on that call, Rivers fraudulently stated that "during the quarter we also modified our debt covenants and raised $177 million in stock offering to gain greater financial flexibility and to provide added liquidity to manage our business in this volatile time." *Id*. The Complaint also alleges that Cogdill fraudulently reported that "in spite of high feed costs," the Company "achieved $16.9 million positive EBITDA for the third fiscal quarter." *Id*. Finally, the Complaint claims that, in response to a question regarding whether the Company was comfortable with its debt covenants for the remainder of 2008 and 2009, Cogdill stated

> Yes, when we realigned those debt covenants last quarter we tried to get something that would give us enough room for the 2008, 2009 year to weather these challenges that we foresaw ahead of us. Obviously, debt covenants are something you get to continue to keep your eye out for, and it is not a thing that

you don't actively look at and manage on a day-to-day basis. But we are going to
be fairly proactive in our entire capital structure like we always have in the past.

Complaint, ¶ 82. In response to a follow-up question regarding whether the covenants were set

assuming that commodity prices remain the same or whether those levels required an

improvement in commodity prices, Cogdill responded "We did a range of analysis from base

case to worst case and best case, and it was somewhere in those ranges is where we came up with

where we thought was reasonable to go to the banks with."[6] *Id.*

Again, the Complaint focuses primarily on the statements that the Company amended its

debt covenants and conducted the Secondary Offering to achieve "greater financial flexibility"

and "to give the company enough room for the 2008, 2009" fiscal years. *See* Complaint, ¶ 84.

The Complaint alleges that these statements were materially false and misleading when made for

the same reasons, based on the same factual allegations, as the allegations with regard to the

allegedly fraudulent statements made on the second and third quarter 2008 Form 10-Qs and SOX

certifications, the May 5, 2008 conference call, the June 4, 2008 presentation, and the July 29,

2008 conference call—i.e. that the Officer Defendants really amended the debt covenants and

issued the Secondary Offering because they knew or recklessly disregarded that (1) the

Company's goodwill recognized in the Gold Kist acquisition was materially impaired as of

January 2008, and (2) coupled with the high costs of producing chicken, the inability to pass

---

[6] The Complaint also discusses an analyst report issued by Deutsche Bank on July 29, 2008 that
relied on the statements of Rivers and Cogdill in making its analysis. Complaint, ¶ 83.
However, the Complaint does not appear to attribute the statements in this report to Cogdill or
Rivers or allege that either Cogdill or Rivers are liable for the report. *See* Complaint, ¶ 84.
Plaintiffs also make no argument in their briefing on the motion to dismiss that any of the Officer
Defendants are liable for the statements made by third party analysts in the Complaint.
Accordingly, the Court will not consider the statements made in the Deutsche Bank report as
allegedly fraudulent statements for purposes of its analysis of the motion to dismiss.

such costs onto customers, the oversupply of chicken, and poor pricing for breast meat, such material impairment would likely cause the Company to fail to comply with its fixed charge covenant ration, thereby triggering an event of default under its credit facilitates. *See* Complaint, ¶ 84.

### i.   Rivers

Since the Complaint pleads no additional facts to support its scienter allegations against Rivers for this allegedly fraudulent statement other than those facts already discussed and dismissed by the Court in its analysis of the other allegedly fraudulent statements made by Rivers, *see* Complaint, ¶¶ 102 and 104, the Court holds that the Complaint has not pled sufficient facts to give rise to a strong inference of River's scienter with regard to the allegedly fraudulent statements he made on the July 29, 2008 conference call with analysts. In making this ruling, the Court relies on its previous analysis in holding that the Complaint does not adequately plead River's scienter with regard to the third quarter 2008 Form 10-Q and SOX certifications and other allegedly fraudulent misstatements throughout the Proposed Class Period.

### ii.   Cogdill

The Complaint pleads no additional statements made by Cogdill or other facts to support its scienter allegations against Cogdill for these allegedly fraudulent statements other than those facts already discussed and dismissed by the Court in its earlier analysis. *See* Complaint, ¶¶ 102 and 104. Accordingly, for all the reasons discussed in the Court's holding that the Complaint did not adequately plead Cogdill's scienter for allegedly fraudulent statements he made on the second and third quarter 2008 Form 10-Qs and SOX certifications as well as the other allegedly fraudulent statements made by Cogdill throughout the Proposed Class Period, the Court also

holds that the Complaint has not pled sufficient facts to give rise to a strong inference of Cogdill's scienter with regard to the allegedly fraudulent statements made on the July 29, 2008 conference call with analysts.

### iii.    L.B. Pilgrim

Because the Complaint pleads no facts linking L.B. Pilgrim to either River's or Cogdill's statements on the July 29, 2008 conference call with analysts, any allegations of securities fraud against L.B. Pilgrim based on these statements fail to adequately plead scienter.

After considering the allegations of scienter against each individual Officer Defendant for each allegedly fraudulent statement, the Court finds that the Complaint fails to satisfy the heightened pleading standard for scienter as to any Officer Defendant for any allegedly fraudulent statement.  Therefore, claim I of Plaintiffs' Complaint alleging securities fraud claims against the Officer Defendants is dismissed.

### 2.  Loss Causation

The PSLRA provides that a private plaintiff who claims securities fraud has the burden of proving that the defendant's fraudulent act or omission caused the loss for which the plaintiff seeks to recover.  15 U.S.C.A. § 78u-4(b)(2).  The general pleading standards of Rule 8 applies to allegations of loss causation in a securities fraud case, not the heightened pleading standards of Rule 9(b).  *See Dura Pharmaceuticals*, 544 U.S. at 346 ("And we assume, at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss"); *Flemming*, 2004 WL 5278716, at * 42 ("The PSLRA does not affect causation pleadings, thus the allegations must only meet the traditional 'fair notice' standards"); *Luke v. Lincoln Nat'l Life Ins.*

*Co.*, 2005 U.S. Dist. LEXIS 42074, at * 12 (E.D. Tex. 2005) ("In *Dura*, the United States Supreme Court held that a plaintiff's pleadings regarding proximate causation and economic loss are governed by Rule 8"); *Dell,* 591 F.Supp.2d at 906 ("The Court finds *Dura*'s reference to an application of Rule 8(a)(2), even if only 'for argument's sake,' indicates Rule 8(a)(2) is the proper standard to apply for determining whether a party has adequately pled loss causation").

Rule 8(a) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Under Rule 8, although complaints are not required to include meticulously detailed allegations in order to survive a rule 12(b)(6) motion to dismiss, the plaintiff must allege more than labels and conclusions or a formulaic recitation of the elements of a cause of action in order to satisfy his obligation to provide the "grounds" of his "entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). At a minimum, the complaint must state a claim that is at least "plausible on its face." *Id*. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Twombly*, 550 U.S. at 556). The Court may not rely on "conclusional allegations or legal conclusions disguised as factual allegations." *Lovick v. Ritemoney, Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004). Additionally, the Court must assume that the allegations in the complaint are true. *See id.*; *see also Neitzke v. Williams*, 490 U.S. 319, 326 (1989). "What Rule 12(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke*, 490 U.S. at 327. The well-pleaded facts must permit the court to infer more than just the mere possibility of misconduct. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50

(2009). "The issue is not whether the plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claim." *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999). Thus, at the pleading stage, a plaintiff is only required to plead a plausible cause of action, and the Court is not authorized or required to determine whether the plaintiff's plausible inference of loss causation is equally or more plausible than other competing inferences. *Dell*, 591 F.Supp.2d at 906.

To sufficiently allege the loss causation element of a securities fraud claim under Rule 8(a)(2), plaintiff must allege:

> a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of a material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss . . . or . . . the complaint must allege enough facts to give rise to a reasonable hope or expectation that discovery will reveal evidence of the foregoing elements of loss causation.

*Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) (internal citations omitted). In addition, "loss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation." *Id.* at 261. These disclosures may also be partial or indirect disclosures of the truth about the alleged fraud disclosed to the market by third parties. *Id.* at 264.

The Complaint alleges that the Officer Defendants' statements were fraudulent because the Officer Defendants knew or should have known that adverse events and circumstances existed in the chicken industry that required the testing and impairment of the goodwill resulting from the Gold Kist acquisition by March 29, 2008 or June 28, 2008. Complaint, ¶¶ 4-7, 102, and 104. As a result, the Complaint alleges that the Officer Defendants knew that the goodwill listed

as an asset on Pilgrim's Pride's books was worth materially less than was reflected on the Company's books, and the materially overstated goodwill served to mask the fact that the Officer Defendants were falsely overstating Pilgrim's Pride's operations, prospects, and financial condition and that Pilgrim's Pride faced potential insolvency. *See, e.g.,* Complaint, ¶¶ 2-7, 46-48, 54, 56, 64, 70, 74, 80, and 84. The Complaint then alleges that the relevant truth—that Pilgrim's Pride was not well protected against the adverse market conditions, that it likely could not comply with its debt covenant ratios, and that it was spiraling towards insolvency—was leaked to the market through a series of partial disclosures consisting of the Company's own press releases regarding its need to renegotiate its debt covenants as well as the downgrading of Pilgrim's Pride's debt ratings by third party rating agencies. *See* Complaint, ¶¶ 8, 9, 85-97, and 114-117. Specifically, the Complaint alleges that the following disclosures constitute the leaking out of the relevant truth regarding the Officer Defendants' alleged misstatements that Pilgrim's Pride was well positioned to survive the challenging market conditions in the chicken industry:

- On September 24, 2008, Egan Jones downgraded Pilgrim's Pride from B- to CCC based on concerns that the Company would trigger its debt covenants. As a result, the Company's stock plunged 38% from its closing price of $10.26 on September 23, 2008 to $6.36 on an extremely high volume of 113.2 million shares before trading on the NYSE was halted at 3:28 pm on September 24, 2008. Complaint, ¶¶ 85 and 114.
- On September 25, 2008, Pilgrim's Pride issued a press release that disclosed for the first time that it expected to report a significant loss in the fiscal fourth quarter and that, as a result, the Company did not expect to be in compliance with its fixed-charge ratio covenant under its principal credit facilities. Pilgrim's Pride attributed the anticipated loss "to high-feed ingredient costs, continued weak pricing and demand for chicken breast meat, and the significant negative impact of hedged grain positions during the quarter." Complaint, ¶¶ 86 and 115.
- According to the September 25, 2008 press release, Pilgrim's Pride was able to obtain verbal agreements from its lenders to "temporarily waive the fixed-charge ratio covenant trough October 28, 2008, and to provide continued liquidity under these facilities during this same period." On that day, S&P downgraded Pilgrim's Pride to CCC+ from BB- because the Company had triggered one of its debt covenants. As a result of the press release and the S&P downgrade, the price of Pilgrim's Pride common stock fell to $3.84,

a drop of 39.6% on extremely high trading volume of 21.7 million shares. Complaint, ¶¶ 86 and 115.

- On September 26, 2008, Moody's Investors Service lowered Pilgrim's Pride's corporate family rating and probability of default rating from B1 to B2. The Company's stock fell an additional 7.55% to close at 3.55 per share on heavy volume. Complaint, ¶¶ 87 and 116.

- On September 29, 2008, Pilgrim's Pride announced that it had successfully completed a definitive written agreement to temporarily waive its credit facility ratios, but that it had also retained outside experts to work with management to work on strategic issues, operational improvement, and refinancing and recapitalization opportunities. The price of Pilgrim's Pride common stock fell to $2.790, an additional 21% drop, on heavy volume. Complaint, ¶ 88.

- On October 27, 2008, Pilgrim's Pride announced that it had received another extension of its credit facility waivers. In response to this announcement, S&P lowered Pilgrim's Pride's rating to CC from CCC+ and revised the CreditWatch implications to "negative" from "developing." The price of Pilgrim's Pride common stock fell from a close of $2.13 on October 27, 2008 to a close of $1.40 on October 28, 2008, a 34.2% drop on heavy volume. Complaint, ¶¶ 89, 90, and 117.

As demonstrated above, the Complaint also alleges that each of these disclosures caused a drop in Pilgrim's Pride's stock price until, by October 30, 2008, the stock was trading below $1.00 a share. *See* Complaint, ¶¶ 85-91. Then, on November 28, 2008, Pilgrim's Pride announced that it would suffer a net loss of $802 million for the fourth quarter of fiscal year 2008, $501.4 million of which was due to the total impairment of the goodwill from the Gold Kist acquisition. Complaint, ¶ 93. Pilgrim's Pride subsequently filed for bankruptcy on December 1, 2008. Complaint, ¶ 94. The Complaint also alleges that the total impairment of the goodwill was, according to Pilgrim's Pride's own Form 10-K filed with the SEC on December 12, 2008, the result of downward pressure placed on earnings by the increased cost of feed ingredients, weak demand for breast meat, and the oversupply of chicken and other animal-based proteins in the United States. Complaint, ¶ 96.

For purposes of pleading loss causation, the Complaint has adequately pled material misrepresentations on the part of the Officer Defendants, i.e. that the Officer Defendants failed to

test and impair the goodwill and materially overvalued the goodwill in order to mask the precarious financial position of Pilgrim's Pride and the fact that Pilgrim's Pride was spiraling towards insolvency. *See* Complaint, ¶¶ 5, 7, 46-48, 54, 56, 59-69, 71-80, and 82-84. Consequently, to determine whether Plaintiffs have adequately pled loss causation, the Court must determine if the Complaint alleges that: (1) the "truth" revealed by the partial disclosures listed above is "relevant or related to" the Officer Defendants' alleged misstatements exaggerating the value of the Gold Kist goodwill and inflating Pilgrim's Pride's financial condition; and (2) the leaking of the truth regarding Pilgrim's Pride's precarious financial position, including the total impairment of the Gold Kist goodwill and the Company's inability to meet its debt covenant ratios, caused a significant part of the depreciation of Pilgrim's Pride's stock price, resulting in economic damages to Plaintiffs. *See Lormand,* 565 F.3d at 258.

The Court will first consider whether the truth revealed in the series of partial disclosures listed in the Complaint are "relevant or related to" the Officer Defendants' alleged misstatements. Plaintiffs argue that the series of partial disclosures listed in the Complaint leaked the relevant truth concerning Pilgrim's Pride's precarious financial position and the fact that it was not, in fact, protected against the volatile market conditions in the chicken industry as the Officer Defendants' alleged misstatements suggested. Defendants, however, argue that this attempt to group a variety of negative press releases and analysts' reports, followed by stock price declines, fails to adequately plead how the "truth" ultimately entered the market and caused a stock price decline. Defendants further argue that these disclosures are not relevant or related to the Officer Defendants' allegedly fraudulent statements because none of the alleged disclosures of the truth during the Proposed Class Period discuss the impairment of the

Company's goodwill. In fact, Defendants point out that the first disclosure that related to the impairment of the goodwill did not occur until after the close of the Proposed Class Period, on November 28, 2008.

The Fifth Circuit has held that demonstrating that the leaked truth is relevant or related to the misrepresentation is not a "steep or difficult standard[] to satisfy." *Lormand*, 565 F.3d. at 256 n. 20. Plaintiff argues that it does not matter that the disclosures listed in the Complaint do not specifically explain that the Pilgrim's Pride's significant loss in the fiscal fourth quarter of 2008 was due to the complete impairment of the goodwill from the Gold Kist acquisition. It is sufficient, Plaintiffs contend, that the *financial impact* of the failure to timely test for and impair the Gold Kist goodwill was disclosed and the market declined. The Court agrees that the Complaint has adequately pled that the partially corrective disclosures listed in the Complaint are relevant or related to the alleged misstatements of the Officer Defendants because those disclosures reveal the precarious financial position of Pilgrim's Pride, including the Company's inability to meet its debt covenant ratios, that the Officer Defendants allegedly attempted to mask by failing to timely test and impair the Gold Kist goodwill. For example, the downgrading of Pilgrim's Pride's debt ratings by various third party rating agencies based on concerns that the Company would trigger its debt ratios revealed part of the relevant truth that the Company was in a more dire financial position than the Officer Defendants' allegedly fraudulent statements suggested and that it might not be able to meet its debt covenant ratios. *See* Complaint, ¶¶ 8, 85-87, 89-90, and 114-117. Similarly, Pilgrim's Pride's own press releases that its ability to meet its debt covenant ratios was hindered by significant losses in the fourth fiscal quarter of 2008 also revealed part of the truth. Those press releases state that the losses in the fourth fiscal quarter

resulted from the same market conditions that ultimately caused the total impairment of the Company's goodwill—high feed ingredient costs, continued weak pricing and demand for chicken breast meat, and the significant negative impact of hedged grain positions. Coupled with the information that the Company needed to renegotiate its debt covenant ratios and hire outside experts to help it get back on track financially, these statements also disclosed at least part of the relevant truth concerning the Company's true financial position. *See* Complaint, ¶¶ 86, 88-90, 93, 96, 115, and 117. The Court holds that Plaintiffs have pled enough facts to "give rise to a reasonable hope or expectation that discovery will reveal evidence" that the partially corrective disclosures resulted in the leaking out of the relevant or related truth about the Officer Defendants' alleged misstatements and caused a significant part of the depreciation of the stock. *See Lormand*, 565 F.3d 228 at 258 (citing *Twombly*, 550 U.S. at 556). The Court also notes that, so long as this standard is met, a district court may not dismiss a claim under Rule 12(b)(6) even if it believes that "actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation and citation omitted).

Finally, the Court concludes that Plaintiffs have adequately pled that the leaking of the relevant truth regarding the alleged misstatements through these partial disclosures caused a significant part of the depreciation of the stock and Plaintiffs' economic loss because the Complaint links each partial disclosure to a corresponding drop in Pilgrim's Pride's stock price. *See* Complaint, ¶¶ 85-91 and 111-118; *see also Fleming*, 2004 WL 5278716, at *42 (finding that plaintiff had adequately pled loss causation by pleading the stair step decline in the price of the stock following the release of negative information from the company and other third parties in which the relevant truth regarding the fraud was revealed).

In conclusion, the Complaint adequately pleads loss causation because the series of partial disclosures in the Complaint demonstrate a plausible causal relationship between the Officer Defendants' alleged misstatements concealing the true financial position of Pilgrim's Pride as a result of their failure to test and impair the Gold Kist goodwill and the harm that investors suffered because of the decline in Pilgrim's Pride's stock price when the truth about Pilgrim's Pride's allegedly precarious financial position and inability to meet its debt covenant ratios was revealed.

### 3. Dismissal without Prejudice

Defendants argue that the Complaint should be dismissed with prejudice because Plaintiffs have already been provided an opportunity to amend the Complaint and because Plaintiffs will be unable to amend the Complaint to satisfy the heightened pleading requirements of the PSLRA. However, the Court is not convinced that a dismissal with prejudice is warranted. Leave to amend should be freely granted when justice requires. Fed. R. Civ. P. 15(a); *see also Cent. Laborer's Pension Fund v. Integrated Electrical Servs. Inc.*, 497 F.3d 546, 552 (5th Cir. 2007). In addition, although district courts have discretion to manage their dockets, there is a strong presumption in favor of granting leave to amend a complaint. *Blackwell*, 440 F.3d at 291. A dismissal with prejudice "is an extreme sanction that deprives the litigant of the opportunity to pursue his claim." *Berry v. CIGNA/RSI-CIGNA*, 975 F.2d 1188, 1191 (5th Cir. 1992). Consequently, the Fifth Circuit has limited district courts' discretion in dismissing cases with prejudice. *Id.*

Permissible reasons for denying leave to amend a complaint include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by

amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Cent. Laborers' Pension Fund*, 497 F.3d at 556 (quoting *Forman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227 (1962)). "[P]rejudice is the 'touchstone of the inquiry under rule 15(a).'" *Lone Star Ladies Investment Club, et al., v. Schlotzsky's Inc., et al*., 238 F.3d 363, 368 (5th Cir. 2001) (quoting *Lowrey v. Texas A & M Univ. Sys*., 117 F.3d 242, 246 (5th Cir. 1997)). The original complaint was filed on October 29, 2008 by Mr. Ronald Acaldo. On May 21, 2009, the Court appointed the Montgomery County Retirement Board and Cambria County Retirement Board as the lead plaintiff, and the lead plaintiff filed the Consolidated Class Action Complaint ("Complaint"), which is the subject of this motion, on June 26, 2009. This is certainly not a case where Plaintiffs have been given multiple chances to correct pleading deficiencies and have failed to do so, making it unlikely that the deficiencies will be corrected in a future amendment because the lead plaintiff has filed only one complaint. In addition, Defendants have made no argument that they will be prejudiced in any way if the Complaint is dismissed without prejudice. The Court is also not convinced that granting Plaintiffs leave to amend the Complaint would be futile. Accordingly, count 1 of the Complaint alleging securities fraud under Section 10(b) of the 1934 Exchange Act and Rule 10b-5 against the Officer Defendants is dismissed without prejudice.

**B. Count II: Controlling Person Liability under Section 20(a) of the 1934 Exchange Act**

Count II of the Complaint alleges controlling person liability pursuant to Section 20(a) of the 1934 Exchange Act against the Officer Defendants. Section 20(a) states: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same

extent as such controlled person to any person to whom such controlled person is liable . . ." 15 U.S.C.A. § 78t(a). Since Section 20(a) is a secondary liability provision, it is necessary that a primary violation be established before liability under Section 20(a) arises. *ABC Arbitrage*, 291 F.3d at 348 n. 57. Accordingly, the failure of a plaintiff to state a claim for primary securities fraud violations under Section 10(b) or Rule 10b-5 necessarily constitutes a failure to state a claim for control-person liability under Section 20(a). *Blackwell*, 440 F.3d at 288 (citing *ABC Arbitrage*, 291 F.3d at 362 n. 123)). Because the Complaint fails to adequately plead scienter as an element of its securities fraud claim, it has failed to adequately plead a primary violation upon which controlling person liability can rest. As a result, the Complaint's controlling person liability claim against the Officer Defendants pursuant to Section 20(a) also fails under Rule 12(b)(6). Count II of the Complaint is, thus, dismissed without prejudice.

### C.  Count III:  Negligent Misrepresentation under Section 11 of the 1933 Securities Act

Count III of the Complaint alleges that the Officer and Director Defendants made negligent misstatements or omissions in connection with the sale of securities pursuant to Section 11 of the 1933 Securities Act based on alleged misstatements or omissions made in connection with the Pilgrim's Pride's Secondary Offering on May 14, 2008. Specifically, the Complaint alleges that the offering documents for the Company's Secondary Offering included the automatic shelf registration statement on SEC Form S-3 and all subsequently filed prospectus supplements ("Offering Documents"). Complaint, ¶ 140. The Complaint also alleges that the financial results for the three months and six months ended March 29, 2008, which were incorporated by reference into a prospectus supplement issued on May 14, 2008, were materially false because the Officer and Director Defendants negligently failed to revalue and impair the

goodwill recognized by Pilgrim's Pride as a result of the Gold Kist acquisition despite the fact that adverse events and circumstances in the chicken industry required the testing and impairment of the goodwill under GAAP as early as January 2008, but no later than March 19, 2008. Complaint, ¶¶ 141 and 145-150.

Section 11 imposes liability if any part of a registration statement or prospectus contains an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading and grants standing to sue to any person acquiring such security. 15 U.S.C. § 77k(a). "Section 11 of the 19333 [Securities] Act allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement." *Herman & McLean v. Huddleston*, 459 U.S. 375, 381, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Section 11 was designed to assure compliance with the disclosure provisions of the 1933 Securities Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering. *Id*. at 382; *see also* H.R.Rep. No. 85, 73d Cong., 1st Sess. 9 (1933) (stating that Section 11 creates "correspondingly heavier legal liability" in line with responsibility to the public).

The elements of a claim under Section 11 are: (1) an omission or misstatement, (2) of a material fact required to be stated or necessary to make other statements made not misleading. *Krim v. BancTexas Group, Inc*., 989 F.2d 1435, 1445 (5th Cir. 1993). "A 'material' fact is one which a reasonable investor would consider significant in the decision whether to invest, such that it alters the 'total mix' of information available about the proposed investment." *Id*.; *see also Kapps v. Torch Offshore, Inc*., 379 F.3d 207, 213-214 (5th Cir. 2004) ("A fact is material if

there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision.") (internal citation and quotation omitted).

Actual knowledge of falsity is not an element of a Section 11 claim, and the Section 11 plaintiff generally does not have to establish scienter. *Herman & MacLean*, 459 U.S. at 382; *Schlotzsky's,* 238 F.3d at 369. If a plaintiff purchased a security issued pursuant to a registration statement, then he or she need only show a material misstatement or omission to establish his prima facie case because liability against the issuer of a security is virtually absolute, even for innocent misstatements. *Herman & McLean*, 459 U.S. at 382. Thus, Plaintiffs do not have to allege that the misstatements or omission in the Offering Documents were knowingly or intentionally false because Section 11 claims do not sound in fraud. *See Id.*; *Schlotzsky's*, 238 F.3d at 369.

However, citing *Melder*, Defendants argue that the Complaint's Section 11 claims sound in fraud and are subject to the heightened pleading standards of Rule 9 because they are premised upon the same allegations of fraudulent conduct as the fraud claims under the 1934 Exchange Act. 27 F.3d at 1100 n.6. In *Melder,* the Fifth Circuit held that the heightened pleading requirements of Rule 9(b) apply to 1933 Securities Act claims when those claims are "grounded in fraud rather than in negligence." *Id.* Accordingly, the court affirmed dismissal of the 1933 Securities Act claims pursuant to Rule 9(b) for failure to sufficiently plead scienter, noting the complaint's "wholesale adoption" of fraud allegations as the basis for the Section 11 claims under the 1933 Securities Act. *Id.* Subsequently, in *Schlotzsky's*, the Fifth Circuit held that, while the heightened pleading standards of Rule 9(b) apply to all averments of fraud whether they are part of a claim of fraud or not, "it does not follow . . . that Rule 9(b) or *Melder* justifies

dismissing a 1933 [Securities] Act claim when, disregarding the deficient allegation of fraud, a claim is stated." 238 F.3d at 368.

In *Schlotzsky's*, the district court dismissed a complaint alleging that directors and officers of Schlotzsky's violated the 1933 Securities Act and the 1934 Exchange Act in their required financial filings, including a public offering of securities. *Id.* at 365. Granting a Rule 12(b) motion to dismiss with prejudice, the district court held that the plaintiffs had not pled facts sufficient to give rise to a strong inference of scienter with regard to the 1934 Exchange Act claims as required by the PSLRA. *Id.* at 367. Relying on *Melder,* the district court then applied the heightened pleading standards of Rule 9(b) to the 1933 Security Act negligence claims and dismissed those as well because of plaintiffs' failure to adequately plead scienter. *Id.* The district court held that the 1933 Security Act claims were "merely wholesale adoptions of plaintiffs' section 19(b) securities fraud claims" and, thus, sounded in fraud. *Id.* The district court then denied plaintiffs' request to file an amended complaint that dropped all claims under the 1934 Exchange Act and relied solely on asserted violations of the 1933 Securities Act. *Id.*

On appeal, the Fifth Circuit held that the district court erred in denying plaintiffs leave to file their amended complaint holding that "[i]n *Melder*, the application of Rule 9(b) was fatal because of the complaint's *wholesale* adoption of the allegations under the securities fraud claims for purpose of the Securities Act claims." *Id.* at 368 (internal quotations and citations omitted) (original emphasis). However, because the proposed amended complaint expressly did not assert that the defendants were liable for fraudulent or intentional conduct and disavowed and disclaimed any allegations of fraud, the Fifth Circuit held that those claims did not sound in fraud and could not be dismissed for failure to satisfy Rule 9(b). *Id.* at 369. Thus, where

averments of fraud are made in a claim in which fraud is not an element, such as a 1933 Securities Act claim, an inadequate averment of fraud under Rule 9(b)'s heightened pleading standard does not mean that no claim has been stated. Instead, the court should disregard the averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated. *Id.* at 368. However, "a district court need not rewrite such a deficient complaint. It may dismiss, without prejudice, placing that responsibility upon counsel." *Id.*

Furthermore, this Court has held that the heightened pleading requirements of Rule 9(b) do not apply to 1933 Securities Act claims when the plaintiffs expressly disavow all allegations of fraud or scheme. *Fleming*, 2004 WL 5278716, at *44 (citing *Schlotzsky's*, 238 F.3d 363); *see also American Realty Trust, Inc. v. Hamilton Lane Advisors, Inc.*, 115 Fed. Appx. 662, 669, 2004 WL 2297150, at * 4 n. 30 (5th Cir. 2004) (stating that negligent misrepresentation claims do not become subject to Rule 9(b) simply because they are based on the same operative facts as fraud claims); *In re Enron Sec. Litig.*, 258 F.Supp.2d 576, 639 (S.D. Tex. 2003) (stating that because the complaint "expressly states that the claims against [defendants] are not grounded in fraud, and because the claims can be viewed as grounded in strict liability or negligence, heightened pleading standards and scienter are not applicable"). Thus, notice pleading under Rule 8 is all that is required to properly state a negligence claim under Section 11 of the 1933 Securities Act so long as the Plaintiffs have expressly disavowed all allegations of fraud or scheme in the Complaint. *See Fleming*, 2004 WL 5278716, at *44.

In the present case, the Complaint does not base its Section 11 negligence claims on a wholesale adoption of the allegations upon which its 1934 Exchange Act securities fraud claims are based. Instead, in pleading its 1933 Securities Act negligence claims, the Complaint

specifically disavowed its fraud allegations. Complaint, ¶¶ 139, 174, and 186. Additionally, the Complaint incorporates by reference only selective portions of the factual allegations supporting the fraud claim when pleading negligence under Section 11 of the 1933 Securities Act and states specifically that those portions of the Complaint are incorporated "only to the extent . . . that such allegations do not allege fraud, scienter or intent of the Defendants to defraud Plaintiffs or member of the Class." Complaint, ¶¶ 139 and 174. It is also important to note that the 1933 Securities Act negligence allegations focus on the false statements made in the Secondary Offering documents, not on the allegedly fraudulent public statements that form at least part of the basis of the Complaint's 1934 Exchange Act fraud claims. So, although the general allegations regarding the Defendants' failure to test and impair the Gold Kist goodwill are at the heart of both allegations, the facts that underlie the fraud and negligence claims are at least facially different. Additionally, the Complaint's 1934 Exchange Act fraud claims are alleged solely against the Officer Defendants, and not against the Director Defendants, while the 1933 Securities Act negligence claims are alleged against both the Officer and Director Defendants. It cannot be said, therefore, that the 1933 Securities Act negligence claims sound in fraud as to the Director Defendants. For all of these reasons, the Court finds that the Complaint's 1933 Securities Act negligence claim does not sound in fraud and that it expressly disavows all allegations of fraud or scheme. Accordingly, the 1933 Securities Act negligence claims are not subject to the heightened pleading requirements of Rule 9(b).

Applying Rule 8's notice standards as articulated by the Supreme Court in *Twombly*, the Court finds that the Complaint sufficiently alleges a negligent misrepresentation claim under Section 11 of the 1033 Securities Act because it alleges that Pilgrim's Pride's Offering

Documents were materially misleading because the Officer and Director Defendants negligently failed to test for impairment and materially impair the Gold Kist goodwill as of at least March 29, 2008. Complaint, ¶ 151-54. Specifically, the Complaint alleges that had the Officer and Director Defendants acted with reasonable diligence, they should have known that adverse changes in the chicken industry as well as Pilgrim's Pride's business climate and negative cash flows from operations made it more likely than not that the carrying value of the Company's chicken segment—which included the Gold Kist goodwill—was higher than its actual fair value, requiring that the Officer and Direct Defendants test and materially impair the Gold Kist goodwill under GAAP at least as of March 28, 2008. Complaint, ¶¶ 146-149 and 151-154. The Court concludes that this is enough to satisfy the notice pleading requirements for a Section 11 negligent misrepresentation claim pursuant to the 1933 Securities Act.

### D. Count IV: Controlling Person Liability Under Section 15 of the 1933 Securities Act

Count IV of the Complaint alleges controlling person liability under Section 15 of the 1933 Securities Act against the Officer Defendants. Specifically, the Complaint alleges that each of the Officers Defendants, by virtue of his control, ownership, office, directorship, and specific acts, was a controlling person of Pilgrim's Pride under Section 15 of the 1933 Securities Act at the time of the Defendants' violations of Section 11 of the 1933 Securities Act. Complaint ¶ 190. The Complaint also alleges that the Officer Defendants had the power and influence, and exercised that power and influence, to cause the Defendants to engage in the alleged violations of Section 11, and that the Officer Defendants' control, ownership, and position made them privy to and provided them with actual knowledge of the material facts concealed from the Plaintiffs and the class. Complaint, ¶¶ 190 and 191.

Section 15 of the 1933 Securities Act provides that

Every person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under section[ ] 77k . . . shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o. "The term 'control' means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. Although worded differently, the control person liability provisions of Section 15 of the 1933 Securities Act and Section 20(a) of the 1934 Exchange Act are interpreted in the same manner. *See Abbott v. Equity Group, Inc*., 2 F.3d 613, 619 n. 15 (5th Cir.1993), *cert. denied sub nom. Turnbull v. Home Insurance Co*., 510 U.S. 1177, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994).

To state a claim for control person liability, a plaintiff must allege that a primary violation was committed and that the defendant directly or indirectly controlled the violator. *In re Dynegy, Inc. Sec. Litig.*, 339 F.Supp.2d 804, 828 (S.D. Tex. 2004) (citing *Kapps*, 379 F.3d at 221); *see also G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 957-58 (5th Cir. 1981); *McNamara v. Bre-X Minerals Ltd*., 46 F. Supp. 2d 628, 635-37 (E.D. Tex. 1999); *but see Dennis v. General Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990) (citing *G.A. Thompson* but stating that to make out a *prima facie* case for controlling person liability under Section 15, the plaintiff must prove that the controlling defendant induced or participated in the alleged violation). "Control can be established by demonstrating that the defendant possessed the power to direct or cause the direction of the management and policies of . . . a person through ownership of voting securities, by contract, business relationships, interlocking directors, family relations, or the

power to influence and control the activities of another." *Dynegy, Inc.*, 339 F.Supp.2d at 828 (citing *Ellison v. American Image Motor Co. Inc.*, 36 F.Supp.2d 628, 638-639 (S.D.N.Y. 1999) (applying same test to 1933 Securities Act Section 15 claims and 1934 Exchange Act Section 20(a) claims)). In the Fifth Circuit, plaintiffs need not allege that the controlling person actually participated in the underlying primary violation to state a claim for control person liability. *See G.A. Thompson*, 636 F.2d at 958 (rejecting as a requirement for a prima facie case an allegation that the controlling person actually participated in the underlying primary violation). Nevertheless, a plaintiff needs to allege some facts beyond a defendant's position or title that show the defendant had actual power or control over the controlled person. *Dennis*, 918 F.2d at 509-510.

Defendants' only argument regarding Count IV of the Complaint is that because the Complaint failed to allege a Section 11 violation, the Section 15 claim for controlling person liability must be dismissed. It is true that the controlling person liability of Section 15 of the Securities Act is derivative of the Section 11 claim and that the failure to properly plead a Section 11 violation necessarily mandates the dismissal of controlling person claims under Section 15. *Rosenweig v. Azurix Corp.*, 332 F.3d 854, 863 (5th Cir. 2003). However, because the Court holds that the Complaint properly states a claim under Section 11 of the 1933 Securities Act, the Court also finds that Count IV of the Complaint alleging controlling person liability under Section 15 of the 1933 Securities Act is properly alleged.

### E.  CONCLUSION

For the foregoing reasons, the Court hereby GRANTS-in-part and DENIES-in-part Defendants' Motion to Dismiss Consolidated Class Action Complaint pursuant to Rules 9(b) and

12(b)(6) (Dkt. No. 46). The Court FURTHER ORDERS that count I of the Consolidated Class Action Complaint (Dkt. No. 43) alleging securities fraud under Section 10(b) of the 1934 Exchange Act and Rule 10b-5 against the Officer Defendants is DISMISSED WITHOUT PREJUDICE. Count II of the Consolidated Class action Complaint (Dkt. No. 43) alleging controlling person liability pursuant to Section 20(a) of the 1934 Exchange Act against the Officer Defendants is also DISMISSED WITHOUT PREJUCICE. Plaintiffs are granted leave to file an amended complaint within 30 days from the date of this order. Defendants shall file an answer to the amended complaint or a motion to dismiss the amended complaint within 20 days of the filing of the amended complaint. Should Defendants file a motion to dismiss the amended complaint, Plaintiffs shall file a response to that motion within 15 days. Defendants shall then file a reply within 10 days. No surreply will be permitted without leave of Court.

IT IS SO ORDERED.

SIGNED this 17th day of August, 2010.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE